MAX N. TOBIAS, JR., Judge.
hThe defendants/appellants, Timothy Hartford (“Hartford”) and Joshua Hogan (“Hogan”) (collectively, “the defendants”), appeal their convictions for attempted looting during a state of emergency, a violation of La. R.S. 14:62.5 C. After a review of the law and evidence, for the reasons that follow, we affirm their convictions and sentences.
On 4 October 2012, Hartford and Hogan were charged by a bill of information with one count of looting during a state of emergency.[1] The defendants pled not guilty at their 11 October 2012 arraignment. Following a preliminary hearing on 11 January 2013, the trial court found probable cause as to both defendants. *1204 Hartford and Hogan were found guilty by a jury in a two-day trial of attempted looting during a state of emergency. The defendants filed motions for new trial and motions for post-verdict judgment of acquittal, which were denied following a hearing on 29 August 2013. The state subsequently filed multiple bills of information as to each defendant, alleging each defendant was a | ¿fourth offender. A multiple offender hearing was conducted on 18 October 2013, and Hartford and Hogan were adjudicated as fourth felony offenders. At the 25 February 2014 sentencing hearing, Hartford and Hogan were each sentenced to twenty years at hard labor, without benefit of parole, probation, or suspension of sentence for the first three years, with credit for time served.[2] The defendants’ motions to reconsider sentence were denied. These timely appeals followed.[3]

STATEMENT OF FACTS

Mr. Mohammed Almasala worked at the Uptown Food Market, located at 2001 Seventh Street in New Orleans since June 2012. In late August 2012, he left New Orleans for a few days due to Hurricane Isaac. Before he left, he locked and secured the store. No holes or damages to the walls existed before he left. When Mr. Almasala returned, he found that someone had entered the store. A hole in the wall was present, and the inside of the building had been damaged. He recognized the defendants from the neighborhood because they had been in the store on numerous occasions. In the process of cleaning up, he found some tools in the backyard of the store, between the fence and the wall with the hole.
On 28 August 2012, New Orleans Police Department (“NOPD”) Officer Troy Pi-chon was assigned to patrol the Sixth District ahead of Hurricane Isaac making landfall. That evening, the winds were forty-nine miles per hour, and it was raining very heavily. Officer Pichón responded to a call of looting at a store at the intersection of Seventh and Danneel Streets. The officer testified that he was very familiar with this area, as he passed it four to five times a day during his | ^normal patrol. He was one block away from the intersection when he received the call of a business burglary. He and Detective Clay, who was driving another police vehicle right behind him, proceeded to the area. When the officers pulled up on the Danneel Street side of the building, everything appeared normal. When he turned onto Seventh Street, Officer Pichón observed that a side gate to an alleyway was swinging open. He pulled up to the alleyway and shined his mounted spotlight down it to get a view of it and the side of the building. He observed Hogan standing facing the wall, with his back to the wooden fence. Hogan turned, looked directly at the spotlight, and then turned his attention back to the hole in the wall. The officer informed dispatch that a person was present in the alleyway and requested additional assistance.
Officer Pichón exited his vehicle and proceeded down the alleyway. He gave Hogan verbal instructions to show his hands. At that time, the officer observed Mr. Spivey straddling the hole with half of his body outside and the other half inside the building. Mr. Spivey exited the building and ran down the alleyway, towards the rear of the building. Hogan stood in place and showed the officer his hands. *1205 While Officer Pichón was dealing with Hogan, other police officers arrived on the scene. Officer Pichón placed handcuffs on Hogan and handed Hogan off to Officer Jeff Young. Officer Pichón asked Hogan if anyone else was in the building. At that time, Mr. Fox put his hands outside the hole and pleaded with the officer not to shoot him. Officer Pichón handcuffed Mr. Fox, escorted him out of the hole and handed him off to Officer Young. Officer Pichón then stuck his head into the hole to get a visual of the interior of the building and to determine if any other subjects were present in the building. The officer shined his handheld flashlight into the building and observed Hartford walking from the rear [4of the building through the food preparation area. After observing Hartford in the building, Officer Pichón told Hartford to get out of the building. Hartford put his hands through the hole, and Officer Pichón handcuffed him and escorted him from the building. Officer Pichón handed Hartford to Officer Young, who took Hartford down the alleyway.
Officer Pichón testified that while Hartford was in the building, Hartford had a sock on one hand. The officer testified that from his experience, burglary suspects will try to conceal their hands to keep from leaving fingerprints on any items that they may touch.
Officer Pichón informed Officer Young that he observed one subject, later identified as Mr. Spivey, run to rear of the alleyway. While Officer Young and another officer went in search of the subject who ran away, Officer Pichón and other police officers entered the building to search and clear the building. No other subjects were found. When the officer when into the store, he observed that a sink or table was pushed away from the wall where the hole was made, and water was flowing from a faucet. A water pipe had been broken when the subjects moved the sink away from the wall in* order to gain entry to the building. Several items, including alcohol and cigarettes, were grouped together on a table. It appeared that the subjects had packaged everything together to carry it out at one time.
As the officers were exiting the budding, Officer Pichón noted that Officer Young had Mr. Spivey in custody. Officer Pichón was informed that the officers had found Mr. Spivey lying next to the fence in a puddle of water and mud, trying to conceal himself.
The crime lab was called out to the scene. The subjects were put in marked police vehicles and transported to Central Lockup. Officer Pichón identified both IsHogan and Hartford at trial. The officer stated that he had seen the defendants together numerous times. Hogan, Hartford, and Mr. Fox hung out together on a daily basis in the 1900 block of Seventh Street, between Dryades and Danneel Streets. The officer was not sure if Mr. Spivey hung out with the other three men on a daily basis.
Officer Young was on patrol on the evening of 28 August 2012, when he responded to a call of looting at the intersection of Seventh and Danneel Streets. When he arrived at the scene, on the Danneel Street side, he observed nothing. However, when he drove to the Seventh Street side of the store, he saw Officer Pichón in a narrow alleyway. Just beyond Officer Pi-chon were two men who were not police officers. As Officer Pichón placed the subjects under arrest, the subjects were passed from one police officer to another, almost like an assembly line, from the alleyway to the street. Officer Pichón passed the subjects to him, and he passed them onto the police officer behind him. Three subjects were arrested in that manner. The fourth subject, Mr. Spivey, was found in the rear corner behind the build *1206 ing, between the building» and the fence. He was lying down in the grass, attempting to conceal himself. Officer Young initially observed Mr. Spivey coming out of the hole and running off. Hogan, however, was standing outside. Mr. Fox and Hartford were inside the building and brought out. Hartford had a sock on his hand when he was arrested.
Erin Cunningham, a crime scene technician with the NOPD, was called to the scene on 28 August 2012. Ms. Cunningham testified that she took photographs of the scene. She identified the photographs and stated that they accurately depicted the scene. The photographs were introduced into evidence.
| (¡Gregory Spivey acknowledged that he had pleaded guilty in the present matter to looting. However, he denied that he was involved in the looting' of the store. Mr. Spivey testified that on 28 August 2012, he was walking down Seventh Street when he saw that the building had a hole in the wall. He was feeling bad, but thought he could ask the owner if he could repair the wall to make a few dollars. Mr. Spivey stated that he has seizures and must have had a. seizure and blacked out at that time because the next thing he remembered was the police officers standing over him while he was lying in puddle of water. He stated that he knew Hogan and Hartford from the neighborhood, but did not know their names. He denied making any statements about what Hogan was doing on the night of the arrest. He claimed he did not make any statement that Hogan wanted to get some stuff from the store.
The state impeached Mr. Spivey’s testimony with a recorded jailhouse telephone call in which Mr. Spivey stated that Hogan was standing outside the hole and said that he “wanted to get some” and asked the other men to “get [him] some.” The phone call was played for the jury.

ERRORS PATENT

A review of the record for patent errors reveals that the sentences imposed by the trial court are illegally lenient. The trial court sentenced both Hartford and Hogan to twenty years at hard labor, with three years without benefit of parole. (The sentences orally handed down are silent concerning the rights relating to probation or suspension of sentence.) The minute entries show that the twenty-year sentences were without benefit of parole, probation, or suspension of sentence for |7the first three years.[4] However, under La. R.S. 14:27,[5] 14:62.5 C,[6] 15:529.1,[7] and State v. *1207 Bruins, 407 So.2d 685, 687 (La.1981), their entire sentences are to be served without benefit of probation or suspension of sentence. Pursuant to State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, the defendants’ sentences are deemed to have been imposed with the restriction of benefits. We find that each defendant’s sentence is for twenty years without benefit of probation or suspension of sentence for the full twenty years and without the benefit parole for the first three years.

DISCUSSION

HARTFORD’S ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, Hartford argues that the state failed to produce sufficient evidence to sustain his conviction for attempting looting during a state of emergency.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, a reviewing court should first determine the ^sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); see also State v. Falkins, 12-1654 (La.App. 4 Cir. 7/23/14), 146 So.3d 838. In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Coleman, 12-1408, pp. 8-9 (La.App. 4 Cir. 1/8/14), 133 So.3d 9, 17-18. However, a reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988); see also State v. Peters, 12-1641, p. 16 (La.App. 4 Cir. 8/21/13), 123 So.3d 307, 316, writ denied, 13-2259 (La.3/14/14), 134 So.3d 1195. A reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The factfinder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra; State v. Taylor, 12-0345, pp. 18-19 (La.App. 4 Cir. 6/26/13), 118 So.3d 65, 77, writ denied, 13-1830 (La.2/28/14), 134 So.3d 1169. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 384-385 (La.1982); see also State v. Taylor, supra. The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817, 820 (La.1987); see also State v. Lawrence, 09-1637 (La. App. 4 Cir. 8/25/10), 47 So.3d 1003.
La. R.S. 14:62.5 provides in pertinent part:
*1208 A. Looting is the intentional entry by a person without authorization into any dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person, or any structure belonging to another and used in whole or in part as a place of business, or any vehicle, watercraft, building, plant, establishment, or other structure, movable or immovable, in which normal security of property is not present by virtue of a hurricane, flood, fire, act of God, or force majeure of any kind, or by virtue of a riot, mob, or other human agency, and the obtaining or exerting control over or damaging or removing property of the owner.
“Attempt” is defined in La. R.S. 14:27:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
Therefore, to prove that a defendant committed the offense of attempted looting, the state had to present evidence beyond a reasonable doubt that (1) the defendant attempted to enter without authorization into a structure belonging to another; (2) in which normal security of property was not present because of hurricane, flood, fire, act of God, or force majeure of any kind; and (8) obtained or |10exerted control over or damaged or removed property of the owner. State v. Collier, 08-0013, pp. 5-6 (La.App. 4 Cir. 6/18/08), 987 So.2d 869, 872.
In State v. Browning, 06-929 (La.App. 5 Cir. 4/11/07), 956 So.2d 65, the defendant was convicted of attempted looting of a business during a state of emergency. On appeal, the defendant argued that the state failed to prove that he attempted to obtain, exert control over, damage, or remove property of the owner. The court found, relying upon the testimony of the business owner and the deputies who responded to the looting call and apprehended the defendant, that the state produced sufficient evidence to support the conviction. The owner of the business testified that he stored televisions in their boxes on shelves in the storeroom. He also stated that the only entrance into the damaged building was through a hole in an exterior wall. The deputies who investigated the incident testified that it was not easy to gain entrance due to debris near the hole in the wall, and that when they arrived on the scene within five minutes of receiving the looting call, the defendant was the only person found in the building, hiding in the corner of the storeroom behind some debris. Witnesses also testified that a television was found out of its box on top of the debris and was adjacent to the hole in the wall; that he television was the only television not in its box or properly stacked.
In State v. Lopez, 07-0701 (La.App. 4 Cir. 11/7/07), 971 So.2d 416, the victim testified that her house had been gutted as result of damage from Hurricane Katrina. She stated that she tied the front door closed because the door could not be locked in the normal manner due to damage from the hurricane. The victim further testified that when she arrived at her home, she heard people upstairs. The responding police officer stated that he found the defendants hiding in the house and that both defendants attempted to flee when they saw the officers. The | T1 defendants admitted that they were in the house, but stated that they entered only after waiting for their boss to return. Additionally, the victim and the police officer testified that the upstairs was ransacked and items were displaced. The *1209 victim explained that two items which had been upstairs (her coin purse and a bottle of perfume) were found downstairs. This court found that such testimony was sufficient to prove that the defendants had entered the victim’s home, which lacked normal security due to Hurricane Katrina and had exerted control over and removed of the victim’s property, and thus the state met its burden of proving that the defendants were guilty of looting.
In the case at bar, Officer Pichón testified that he responded to a call of a looting at the store. He stated that he was on patrol in anticipation of Hurricane Isaac. At trial, the state introduced the State of Emergency declared in anticipation of Hurricane Isaac. Officer Pichón testified that when he arrived on the scene, he observed one subject, later identified as Hogan, standing in the alleyway outside of store, next to a hole in the wall of the store. After arresting Hogan and Mr. Fox, Officer Pichón then stuck his head into the hole to get a view of the interior of the building and to determine if any other individuals were in the building. He shined his handheld flashlight into the building and observed Hartford walking from the rear of the building through the food preparation area. After observing Hartford in the building, Officer Pichón told Hartford to exit the building. Hartford put his hands through the hole. Officer Pichón handcuffed him and escorted him from the building. Upon entering the store, the officer noted that a sink or table was pushed away from the wall where the hole had been made, and water was flowing out of faucet. A water pipe had apparently broken when the defendants moved the sink 112away from the wall in order to gain entry into the building. Several items, including alcohol and cigarettes, were grouped together on a table, and it appeared that the defendants had packaged everything together to carry it out at one time.
The trial testimony reveals that (1) the defendant entered the store without authorization from the owner, (2) in which normal security of property was not present because of Hurricane Isaac, and (3) obtained or exerted control over or damaged or removed property of the owner. This evidence was sufficient for the jury to conclude that the defendant was guilty of attempted looting during a state of emergency.
This assignment of error is without merit.

HARTFORD’S ASSIGNMENT OF ERROR NUMBER 2

In his assignment of error, Hartford contends that the trial court imposed an excessive sentence. After being adjudicated a fourth felony offender, Hartford was sentenced to twenty years at hard labor, with the first three years without benefit of parole.[8]
Article I, § 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. A sentence “is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime.” State v. Dorthey, 623 So.2d 1276, 1280 (La.1993), quoting State v. Scott, 593 So.2d 704, 710 (La.App. 4 Cir.1991); see also State v. Pernell, 14-0678 (La.App. 4 Cir. 10/15/14), 151 So.3d 940. Because |isthe trial court has broad discretion in imposing a sentence within statutory limits, a reviewing court may only set it aside if it is clearly excessive, rather than because another sentence might have been appropriate. State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d *1210 957, 959; see also State v. Hollins, 11-1435 (La.App. 4 Cir. 8/29/13), 123 So.3d 840, writ denied, 13-2555 (La.4/25/14), 138 So.3d 642.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines and that the sentence is warranted under the facts established by the record. State v. Soco, 441 So.2d 719, 720-721 (La.1983); State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982); see also State v. Hamdalla, 12-1413 (La.App. 4 Cir. 10/2/13), 126 So.3d 619, writ denied, 13-2587 (La.4/25/14), 138 So.3d 642. Because a sentence could be excessive even though it falls within the statutory limit, the trial court’s statement regarding the factors considered under La.C.Cr.P. art. 894.1 are an important aid in reviewing an alleged excessive sentence. State v. Cann, 471 So.2d 701, 703 (La.1985); State v. Hamdalla, supra.
If adequate compliance with article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense charged. State v. Quebedeaux, supra;. State v. Guajardo, 428 So.2d 468, 472 (La.1983).
Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762, 767 (La.1979); State v. Hamdalla, supra. A sentence is | ^unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 So.2d 739, 751 (La.1992).
The minimum sentences imposed on multiple offenders by the Habitual Offender Law are presumed to be constitutional. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 675. A defendant bears the burden of rebutting the presumption that the mandatory minimum sentence is constitutional. State v. Short, 96-2780 (La.App. 4 Cir. 11/18/98), 725 So.2d 23. A court may only depart from the minimum sentence if it finds that there is' clear and convincing evidence in the particular case before it that would rebut the presumption of constitutionality. Johnson, supra.
In the case at bar, Hartford was adjudicated a fourth felony offender and sentenced to twenty years at hard labor, the minimum sentence under the multiple offender statute.[9] He argues that the minimum sentence was excessive. However, he has failed to present clear and convincing evidence that the sentence is excessive.
In State v. Carter, 07-270 (La.App. 5 Cir. 12/27/07), 976 So.2d 196, the defendant was convicted of looting merchandise from a large apparel merchant and | lfiwas sentenced to eighteen years at hard labor, after being adjudicated a second felony offender. The defendant had previously been convicted of armed robbery for which he was sentenced to seven years. The *1211 court found that the defendant’s expressed rationale for looting, the need for clean clothes, was unjustifiable when juxtaposed against the city’s need to maintain law and order. Noting that the defendant received a midrange sentence, the appellate court found no abuse of discretion in the trial court’s sentence.
In sentencing Hartford, the trial court noted that Hartford had three prior convictions within a four-year period: possession of cocaine, possession of a stolen vehicle, and attempted possession of a firearm by a convicted felon; now he stood convicted of attempted looting during a state of emergency. The court also recognized that Hartford had previously had his probation revoked for his conviction for possession of cocaine. The trial court stated that it took into consideration that the incident occurred during the beginning of Hurricane Isaac and that the city was under a state of emergency. The trial judge referenced the testimony of the crime scene technician concerning the rain and wind that she encountered while photographing the scene. The trial court also noted that the police officers and crime scene technician were placed in harm’s way by having to traverse a dark alleyway during the storm.
We find that the trial court set forth sufficient reasons for the sentence imposed, and Hartford produced no evidence to suggest that the sentence is excessive. The trial court did not err in the sentence imposed on him.
This assignment of error is without merit.
| ^HARTFORD’S ASSIGNMENT OF ERROR NUMBER S
Hartford also suggests that the trial court erred when it allowed the state to introduce into evidence of the recorded jailhouse phone calls made by Mr. Spivey. La.C.Cr.P. art. 716 provides in pertinent part:
D. Upon written motion of the defendant, the court shall order the district attorney to disclose to the defen-, dant, and to permit or authorize the defendant to inspect and copy any written or recorded statements of any witness the state intends to call in its case in chief at the trial. For purposes of this Article: (1) “written or recorded statement of a witness” shall mean any audio or audio-video recording of an oral statement or interview of a witness, and any statement a witness writes or signs; (2) for the purposes of this Article, “trial” shall mean the phase of the case at which the state attempts to meet its burden as to guilt, and specifically does not extend to pretrial matters or hearings, or to the penalty phase in capital prosecutions. The state need not provide the defendant any written or recorded statement of its witnesses until immediately prior to the opening statement at trial.
The discovery rules, La. C. Cr. P. art. 716 et seq., are intended to eliminate any unwarranted prejudice that could arise from surprise testimony. State v. Toomer, 395 So.2d 1320, 1329 (La.1981); State v. Harris, 627 So.2d 788, 797 (La.App. 2nd Cir.1993). Not every failure by the state to comply with these rules automatically requires a reversal; however, when such a failure results in prejudice to a defendant, it does necessarily constitute reversible error. Thus, in the event the state failed to comply with the discovery rules, the court must determine whether the defendant was actually prejudiced by the nondisclosure and whether the trial court abused its discretion. Additionally, the effects of a discovery violation may be remedied by effective cross-examination. State v. Vaccaro, 411 So.2d 415, 427-428 (La.1982); State v. Harris, id. (citing State v. Powell, 598 So.2d 454 (La.App. 2nd Cir.1992)).
*1212 117In the case at bar, the state did not provide the defendants with a copy of Mr. Spivey’s recorded jailhouse telephone calls prior to trial. However, the state did not anticipate having to use the recorded telephone calls. The state called Mr. Spivey, whom it expected to testify as to the looting. When Mr. Spivey failed to testify as the state expected (in accordance with his prior recorded statements), he became a hostile witness; the state introduced the recorded telephone calls to impeach Mr. Spivey’s testimony. The defendants objected to the introduction of the phone calls, but the trial court overruled their objections. In allowing the state to admit the recording of the telephone calls into evidence, the trial court stated:
The Court feels that because Mr. Spi-vey has already pled guilty that he is no longer considered to be a co-defendant in terms of any exposure on the case and therefore he can be called by either side with no Fifth Amendment implications.
And that upon that now -witness, former defendant, but now a witness taking the witness stand, that he has denied several times on the witness stand that he made a statement to anyone or offered any statements relative to any other person being involved in this case or even himself.
He’s already testified in front of the jury that the police thought he was dead, that he was unconscious. And that he had no intent to loot or commit any crime at that property.
After the state played the recordings for the jury, the defendants cross-examined Mr. Spivey, who continued to state that he had a seizure on the night of the incident and had no knowledge of the looting.
The trial court recognized that the state had not anticipated using the recorded phone calls during the trial. The state only sought to introduce the recorded phone calls when Mr. Spivey failed to testify in accordance with the statements he had given the police. Thus, the state sought to use the phone calls to impeach Mr. Spivey’s trial testimony, once he became a hostile witness.
In State v. Gonzales, 501 So.2d 824 (La.App. 4th Cir.1986), the defendant argued on appeal that the state should not have been allowed to introduce a statement the defendant allegedly made to the police officer because the statement was not provided to the defendant during discovery, pursuant to La.C.Cr.P. art. 716. Testimony about the statement was introduced during rebuttal and only after the defendant denied ownership of the weapon found in his possession. Prior to concluding that the defendant was not entitled to pre-trial discovery of the statement, this court discussed what the phrase “intends to offer in evidence at trial” includes.
The phrase ‘intends to offer in evidence at the trial’ has not been interpreted in our jurisprudence. However, a similar phrase from a similar code article was interpreted by our Supreme Court in State v. Pool, 361 So.2d 1202 (La.1978). This case dealt with Article 719 which requires the state to allow the defendant to inspect or copy any results or reports of physical or mental examinations and of scientific tests or experiments ‘intended for use at trial’. In Pool, the Court held that introduction of evidence brought out on cross-examination by the defense and expounded upon by the State during redirect was not reversible error because the state had not intended to use it as evidence at the trial within the meaning of Article 719. The Court felt that the fact that this information was not brought out by the State on direct examination and had not mentioned it in their opening statement proved the State had “no intent to use the evidence at trial”.
*1213 In State v. Amedee, 408 So.2d 1259 (La.1982) the Court reiterated this interpretation of the phrase. Here, the State offered evidence of a drug test of the victim during its case in rebuttal to counter the defendant’s claim that the victim was ‘on something’. The Court stated ‘the rebuttal testimony here was not intended for use at trial within the contemplation of the statute.’
We conclude that the facts in the case at bar are similar to Pool and Amedee. The testimony of Officer Sherman was introduced to rebut the defendant’s testimony that the gun was not his. The State did not intend to offer this statement into evidence at the trial within the meaning of Article 716(B).
Gonzales, 501 So.2d at 826.
In State v. Dugas, 96-49 (La.App. 3 Cir. 10/9/96), 683 So.2d 1253, the defendant argued that a letter she had written should have been produced as part of normal discovery. The state contended that it did not have the obligation to produce the letter during discovery because the state did not intend to use it at trial. The letter was introduced 'to rebut the defendant’s testimony. In concluding that the state did not have the obligation to provide the defendant with the letter prior to trial, the Third Circuit relied upon this court’s discussion in State v. Gonzales on the definition of the phrase “intended for use at trial.” The court recognized that the state did not mention the letter in its opening statement or introduce it as part of its case in chief. The letter was sought to be introduced during the state’s cross-examination of the defendant.
In the case at bar, the state did not intend to introduce the recorded telephone calls in its ease in chief. It believed that Mr. Spivey’s testimony would be consistent with the statements he had given previously. However, when Mr. Spivey denied any knowledge of the looting, the state sought to impeach him with the recorded telephone calls. Because the state did not intend to use the recorded telephone calls in its case in chief, the trial court did not abuse its discretion in finding that no violation of the discovery articles occurred.
Furthermore, even if the failure to provide the recorded telephone calls prior to trial was a discovery violation and the calls were erroneously admitted at trial, the trial court’s ruling is subject to a harmless error analysis. State v. Hugle, 11-1121, p. 19 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 613, writ denied 12-2721 (La.6/14/13), 118 So.3d 1079, citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Walker, 99-2868, p. 8 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, 223. The test for determining harmless error is “whether the guilty verdict actually rendered |gnin this trial was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
The admission of the recorded telephone calls was harmless error. Sufficient evidence was presented, without Mr. Spivey’s telephone calls, to prove that Hartford was guilty of attempted looting. Officer Pi-chon’s testimony placed Hartford inside the building when the looting occurred. The officer testified that he found Hartford inside the building after he had already arrested Hogan and Mr. Fox. He stated that he shined his flashlight into the darkened building and saw Hartford walking through the building, near the table with groceries stacked and ready to be removed from the building.
On appeal, Hartford also argues that the trial court erred in admitting the calls into evidence because the state failed to properly authenticate the tapes. A review of the trial transcript reveals that it is questionable whether such an objection was made, and if it was, whether it was timely. *1214 The transcript reveals that the trial court conducted a bench conference on the admissibility of the phone calls. Defense counsel was told to place objections on the record. Thereafter, the trial court heard argument from defense counsel and the prosecution and ruled that the tapes were admissible. The parties returned to the courtroom, and the state continued to question Mr. Spivey, who acknowledged the phone calls. The phone calls were then played for the jury. Subsequent to that, counsel for Hartford stated “Objection, your Honor, to the authenticity of this jail, alleged jail tape.”
La.C.Cr.P. article 841 A states that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence.” In the present case, the trial court gave the defendants an opportunity to place their objections to the admissibility of the tapes during the bench conference. Both | ⅞, defense counsel made their objections and arguments. Hartford’s objection as to authenticity came after the trial court ruled on the admissibility of the tapes and after the tapes were played for the jury. The objection was untimely, and as a result, precludes review of this issue on appeal. See La.C.Cr.P. art. 841.
This assignment is without merit.

HOGAN’S ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, Hogan argues that the state failed to produce sufficient evidence to sustain his conviction for attempting looting during a state of emergency. The standard of review for the sufficiency of evidence has been discussed above in Hartford’s first assignment of error.
As discussed above, Officer Pichón testified that he responded to a call of looting at a store at the corner of Danneel and Seventh Streets. He stated that he was on patrol in anticipation of Hurricane Isaac. At trial, the state introduced into the evidence the State of Emergency declared in anticipation of Hurricane Isaac. Officer Pichón testified that when he arrived on the scene, he observed one subject, later identified as Hogan, standing outside the store in the adjoining alleyway, next to a hole in the wall of the store. After arresting Hogan and Mr. Fox, Officer Pichón then stuck his head into the hole to get a visual of the interior of the building and to determine if any other subjects were present inside. The officer shined his handheld flashlight into the building and observed Hartford walking from the rear of the building through the food preparation area. After observing Hartford in the building, Officer Pichón told Hartford to come out of the building. Hartford put his hands through the hole. Officer Pichón handcuffed him and escorted him from the building. Upon entering the store, the officer noted that a sink or table was pushed away from the wall where the hole was made and water 122was flowing from a faucet. A water pipe had broken when the defendants moved the sink away from the wall in order to gain entry to the building. Several items, including alcohol and cigarettes, were grouped together on a table. It appeared that the defendants had packaged everything together to carry them out at one time.
The trial testimony reveals that Hogan intended to enter or entered the store without authorization from the owner; in which normal security of property was not present because of Hurricane Isaac, and obtained or exerted control over or damaged or removed property of the owner. This evidence was sufficient for the jury to conclude that Hogan was guilty of attempted looting during a state of emergency-
*1215 This assignment of error is without merit.

■HOGAN’S ASSIGNMENT OF ERROR NUMBER 2

In his second assignment of error, Hogan contends that the trial court imposed an excessive sentence. The standard of review for excessive sentences has been set forth above in the discussion of Hartford’s second assignment of error.
In the case at bar, Hogan was adjudicated a fourth felony offender and sentenced to twenty years at hard labor, the minimum sentence under the multiple offender statute. Hogan argues that the minimum sentence was excessive. However, like Hartford, Hogan has not presented clear and convincing evidence that the sentence is excessive.
The trial court, in sentencing Hogan, noted that he had three prior convictions within a three year period: possession of a stolen vehicle, unauthorized use of a motor vehicle, and simple burglary of a motor vehicle. The court also recognized that he previously had his probation revoked in regards to his conviction for possession of a stolen vehicle. The trial court stated that it took into | ^consideration that the incident occurred during the beginning of Hurricane Isaac. and that the city was under a state of emergency. The trial judge referenced the testimony of the crime scene technician concerning the rain and wind that she encountered while photographing the scene. The trial court noted that the police officers and crime lab technician were placed in harm’s way by having to traverse a dark alleyway during the storm.
We find, like in Hartford’s case, that the trial court set forth sufficient reasons for the sentence imposed. Hogan produced no evidence to suggest that the sentence is excessive. The trial court did not err in the sentence imposed on Hogan.
This assignment of error is without merit.

HOGAN’S ASSIGNMENT OF ERROR NUMBER 3

Hogan also suggests that the trial court erred when it allowed the state to introduce into evidence the recorded jailhouse phone calls made by Mr. Spivey. This argument was also raised by Hartford and is discussed in Hartford’s third assignment of error. For the same reasons discussed above, this assignment is without merit. CONCLUSION
Accordingly, Hartford’s and Hogan’s convictions and sentences are affirmed.
AFFIRMED.

. Co-defendants Irvin Fox and Gregory Spi-vey were charged in the same bill of information with looting during a state of emergency. Mr. Spivey pled guilty as charged on 2 April 2013 and was sentenced to three years at hard labor without benefits of parole, probation, or suspension of sentence, with credit for time served. Mr. Fox pled guilty as charged on 29 May 2013, adjudicated a second offender, and was sentenced to ten years at hard labor without benefits of parole, probation, or suspension of sentence, with credit for time served.

. See the discussion of errors patent, infra.

. The exhibits that were introduced at trial by the state were initially thought to be lost.
They were, however, subsequently located, and thus the record on appeal is complete for appellate review.

. Ordinarily, when a conflict exists between an orally assigned sentence and the minute entry of sentence, the orally assigned sentence prevails.

. La. R.S. 14:27 states in pertinent part:
D. Whoever attempts to commit any crime shall be punished as follows:
[[Image here]]
(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.

. La. R.S. 14:62.5 provides in pertinent part:
C. Whoever commits the crime of looting during the existence of a state of emergency, which has been declared pursuant to law by the governor or the chief executive officer of any parish, may be fined not less than five thousand dollars nor more than ten thousand dollars and shall be imprisoned at hard labor for not less than three years nor more than fifteen years without benefit of probation, parole, or suspension of sentence. [Emphasis supplied.]

.According to La. R.S. 15:529.1 G, "[a]ny sentence imposed under the provisions of this Section shall be at hard labor without benefit of probation or suspension of sentence.” [Emphasis supplied.]

. See the discussion of errors patent, supra.

. La. R.S. 15:529.1 A states in pertinent part:
(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then:
(a) The person shall be sentenced to imprisonment for the fourth or subsequent felony for a determinate term not less than the longest prescribed for a first conviction but in no event less than twenty years and not more than his natural life;.... [Emphasis supplied.]