STATE OF LOUISIANA

VERSUS

JARED DIAZ

NO. 20-KA-381

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-2516, DIVISION "N"
HONORABLE STEPHEN D. ENRIGHT, JR., JUDGE PRESIDING


November 17, 2021


**SUSAN M. CHEHARDY**
**CHIEF JUDGE**


Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Stephen J. Windhorst


**CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR
CORRECTION OF ERROR PATENT**
    **SMC**
    **SJW**

**WICKER, J., DISSENTS WITH REASONS**
    **FHW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Thomas J. Butler
     Brittany Beckner
     Lynn Schiffman

COUNSEL FOR DEFENDANT/APPELLANT,
JARED DIAZ
     Lieu T. Vo Clark

COUNSEL FOR DEFENDANT/APPELLANT,
JARED DIAZ
     In Proper Person

**CHEHARDY, C.J.**

Defendant appeals his conviction and sentence for trafficking children for sexual purposes. For the following reasons, we affirm.

## PROCEDURAL HISTORY

On May 2, 2018, the Jefferson Parish District Attorney filed a bill of information charging defendant, Jared Diaz, with one count of trafficking of children for sexual purposes in violation of La. R.S. 14:46.3. At his arraignment on May 4, 2918, Mr. Diaz pled not guilty to the charge.

On October 2, 2018, Mr. Diaz filed a *pro-se* motion to waive his right to counsel and to represent himself. Following a *Faretta*[1] hearing held on October 18, 2018, the trial court granted his motion, but ordered defense counsel, Renee Bourg, to remain as shadow counsel. On February 27, 2019, the State filed its notice of intent to use other crimes evidence pursuant to La. C.E. art. 404(B) and, in the alternative, *res gestae*, and a notice of intent to call expert witnesses. On March 22, 2019, Mr. Diaz filed *pro se* motions for a private investigator and for preliminary examination.[2] A preliminary examination was held on April 25, 2019, and after hearing testimony, the court denied Mr. Diaz's motion and found probable cause for his arrest. Also at this hearing, the trial court granted the State's notice of intent to use other crimes evidence at trial.[3]

---

[1] *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), wherein the U.S. Supreme Court held that criminal defendants have a constitutional right to refuse counsel and represent themselves in state criminal proceedings. At a *Faretta* hearing, the trial judge should inform the defendant of the charges, the basic trial procedures, and the hazards of self-representation. In the instant case, the record is replete with cautionary remarks by the presiding trial judge made to Mr. Diaz throughout the course of the proceedings regarding the seriousness of the charge against him and his decision to represent himself. It is noted that in April 2019, the trial court ordered a private investigator to assist Mr. Diaz with his defense.

[2] In response to Mr. Diaz's motion for a private investigator, on April 11, 2019, the trial court ordered a private investigator to assist Mr. Diaz with his defense.

[3] On June 13, 2019, the trial court granted a Louisiana Uniform Abuse Prevention Order and Firearms Transfer Order against Mr. Diaz, and he was served with a copy in open court.

Mr. Diaz declined a plea offer on December 16, 2019, and indicated he wished to proceed to trial. On January 9, 2020, he was again informed of a plea deal. The matter proceeded to trial on February 10, 2020. At the conclusion of trial on February 12, 2020, the jury returned a unanimous verdict of guilty as charged.

Sentencing for Mr. Diaz was scheduled for March 2, 2020. On that date, Mr. Diaz made an oral motion for a new trial, which, after the matter was argued and submitted, the trial court denied. After a victim impact statement was read, the trial court sentenced Mr. Diaz to serve fifty years at hard labor in the Louisiana Department of Public Safety and Corrections, with credit for time served. The court issued a permanent Louisiana Uniform Abuse Prevention Order and a Firearms Transfer Order. Mr. Diaz was provided with the written notification of his sex offender registration obligations, and was informed of the time delays for appealing his conviction and sentence. Also, the State informed the trial court of its intent to file a multiple offender bill of information against Mr. Diaz.

On March 6, 2020, defendant filed a motion to reconsider sentence, which the trial court denied on March 9, 2020. Also on March 6, 2020, Mr. Diaz filed a motion for appeal, which was granted on March 9, 2020.

On July 14, 2020, following receipt of a handwritten letter from Mr. Diaz, the trial court, on its own motion, ordered the appointment of a sanity commission to evaluate Mr. Diaz's competency to proceed with the multiple bill proceedings. A competency hearing was originally set for August 19, 2020, and was repeatedly continued. At the close of a competency hearing held on March 17, 2021, having reviewed the commission's reports, hearing testimony from the commission's expert of forensic psychiatry, Dr. Richard Richoux, and expert of forensic psychology, Dr. Rafael Salcedo, and having considered the testimony and report of

the State's expert in forensic psychiatry, Dr. Michael Blue, the trial court found Mr. Diaz competent to proceed.[4]

On April 12, 2021, the State filed a multiple offender bill of information alleging Mr. Diaz to be a second felony offender.[5] A multiple offender hearing was conducted that same day and Mr. Diaz was adjudicated a second felony offender. The trial court vacated defendant's original 50-year sentence and, pursuant to La. R.S. 15:529.1, sentenced Mr. Diaz to a term of 65 years imprisonment at hard labor without benefit of probation or suspension of sentence.[6] The trial court ordered that the sentence run concurrently with any and all other sentences Mr. Diaz may be serving, and it informed Mr. Diaz of his sex offender registration requirements. Mr. Diaz was given credit for time served and committed to the Louisiana Department of Public Safety and Corrections.

Mr. Diaz now appeals challenging the excessiveness of his sentence and raises five *pro se* assignments of error.

## FACTUAL BACKGROUND

In this case, concurrent investigations conducted by the Jefferson Parish Sheriff's Office ("JPSO") and the Federal Bureau of Investigations ("FBI") led to the arrest of defendant, Jared Diaz, for trafficking of children for sexual purposes.

At trial, the State called the following witnesses to testify: Deputy Ismael Cornejo, Sergeant Michael Olivier, Detective Ian Donahue, Caitlyn Druckenmiller, Special Agent Jennifer Terry, Lieutenant William Hare, and the victim, M.B.

---

[4] Although Mr. Diaz represented himself at trial, the trial court appointed his shadow counsel, Renee Bourg, to represent him during both the competency proceedings and the multiple bill proceedings.

[5] The predicate offense for the multiple bill was that on October 30, 2013, Mr. Diaz pled guilty to distribution of marijuana, a felony violation of La. R.S. 40:966(A), in the Twenty Fourth Judicial District Court, Division J, case number 13-4316.

[6] Although the trial court vacated Mr. Diaz's original sentence, it did not vacate the Louisiana Abuse Prevention or Firearms Transfer Orders.

***Deputy Ismael Cornejo***

On December 14, 2017, Deputy Ismael Cornejo, who was working in the patrol division of the Kenner Police Department, responded to a 9-1-1 call regarding a robbery investigation involving Jared Diaz. Deputy Cornejo testified at trial that the initial dispatch indicated that two black males had robbed a female and her friend at gunpoint in a hotel parking lot located on Williams Boulevard, taking their money, an iPhone, and an Android phone. According to Deputy Cornejo, on the way to the scene, he spotted a vehicle matching the description of the robbery suspect's vehicle, a white Lincoln MKZ, parked in the lot of a Circle K gas station located a block away from the LaQuinta Hotel where the robbery had purportedly occurred. Deputy Cornejo stated that when he approached the vehicle, he observed two black males matching the description provided by the 9-1-1 caller. He testified that Mr. Diaz advised him that there was a BB gun underneath his seat. When Mr. Diaz and the passenger, Kenneth Patterson, exited the vehicle, Deputy Cornejo observed a BB gun, which looked like a handgun, underneath the seat, and several cell phones in the center console, one of which matched the description described by dispatch. Deputy Cornejo testified that he did not search Mr. Diaz, but only patted him down for weapons.

According to Deputy Cornejo, there were a total of five cell phones found in the vehicle, two of which Mr. Diaz and Mr. Patterson claimed ownership. Deputy Cornejo seized the remaining three phones, including a white iPhone with a "glittery" case, a purple phone matching the description provided to dispatch, and a black iPhone. He stated that while he was interrogating Mr. Diaz and Mr. Patterson at the Circle K, other officers responding to the 9-1-1 call were at the LaQuinta Hotel trying to find the 9-1-1 caller, who was never located.

***Sergeant Michael Olivier***

On January 23, 2018, the JPSO, Vice Crimes Division, was conducting an investigation into the illegal escort services providing prostitution at hotels on the East Bank of Jefferson Parish, and were looking for possible human trafficking victims. At trial, Sergeant Michael Olivier testified that during the investigation, he and his unit located a Backpage.com advertisement, which was admitted into evidence, containing multiple photographs of a female promoting an alluring encounter with a 21-year-old in Lakeview. According to Sergeant Olivier, the reason the advertisement caught the unit's attention was because it depicted a young female, who was later identified as 17-year-old M.B.,[7] the victim herein. Using the contact number listed on the advertisement, via text messaging, Sergeant Olivier was able to set up a "date" at the Super 8 Motel in Metairie, Louisiana. Although Sergeant Olivier was texting to the contact number listed in M.B.'s advertisement on Backpage.com, he had no way of knowing whether he was actually communicating with M.B. or with someone else on her behalf. The text messages included pricing ($100–20 minutes, $150–30 minutes, $200–an hour), and queried whether the "date" would be for an in-call, out-call, or car "date," all of which confirmed for Sergeant Olivier that the "date" was one for prostitution.[8]

When Sergeant Olivier arrived at the Super 8 Motel, other detectives from the JPSO vice unit were in the area surveilling. He went to the designated room, 235, and was greeted by M.B., who matched the photographs in the Backpage.com advertisement. After M.B. agreed to exchange sex for money, Sergeant Olivier gave the pre-arranged signal for backup officers to come to the hotel room and

---

[7]     Herein, the victim will be identified by initials only in accordance with La. R.S. 46:1844(W), which allows the Court to protect the identity of a crime victim who is a minor, a victim of sex offense, or a victim of a human trafficking related offense by using his or her initials.

[8]     Sergeant Olivier explained that an "in-call" is where the client goes to the prostitute, an "out-call" is where the prostitute goes to the client, and a "car date" is where the prostitute meets the client at a car and the prostitution act takes place.

effect the arrest. M.B. was arrested on the scene and officers seized a cell phone found in her possession. When the officers ran M.B.'s name, they learned that she was 17 years old. When asked if she was being forced to conduct prostitution dates, M.B. refused to answer and refused to cooperate with law enforcement. Officers then spoke with the hotel manager, who confirmed that Jared Diaz was the person who rented Room 235, and provided a photocopy of his driver's license, which Mr. Diaz used during check-in. Sergeant Olivier identified photographs of the Super 8 Motel room, of the bathroom where M.B. placed the money that was given to her for the prostitution date, and of condoms and petroleum jelly, which he explained where known "tools of the trade" for prostitutes.

Sergeant Olivier testified that after M.B.'s arrest, JPSO continued its investigation and were able to connect Mr. Diaz to M.B. through multiple motel room registrations and computer searches. On January 24, 2018, and January 25, 2018, a court order was obtained for M.B.'s advertisement on Backpage.com. The Backage.com return identified the account holder's email address as C.Drunkenmiller@yahoo.com, and provided more information for the JPSO's investigation into Jared Diaz. Additional research by JPSO revealed the identity of Mr. Diaz's vehicle as a 2012 white Lincoln MKZ registered in his name.

### *Detective Ian Donahue*

Detective Ian Donahue of the JPSO, who also participated in the investigation of M.B. and Mr. Diaz, testified at trial that once learning from the Backpage.com return that the holder of the account was Caitlyn Druckenmiller, he contacted her on the phone number listed in one of the advertisements and set up a "car date" with her, which she explained would cost $60. He met with her at the agreed upon location, which he believed was in front of her house, and once she asked for the money and the services were discussed, Detective Donahue gave the pre-arranged signal to JPSO officers surveilling in the area. He was then pulled

over and Ms. Druckenmiller was arrested. Ms. Druckenmiller cooperated with law enforcement, providing information concerning her connections with Mr. Diaz and M.B. She also disclosed the name of Michelle Scala, a third female associated with Mr. Diaz. Ms. Druckenmiller sent Detective Donahue screenshots of Ms. Scala from Instagram and Facebook, from which JPSO officers were able to further their investigation of Mr. Diaz. Based upon JPSO's investigation into Mr. Diaz, Sergeant Olivier prepared an affidavit for arrest warrants for Mr. Diaz for trafficking children for sexual purposes and for pandering.

Using the information provided by Ms. Druckenmiller, Sergeant Olivier contacted Michelle Scala through a Backpage.com advertisement. Through text messages, Sergeant Olivier set up an "out-call date" with Ms. Scala for February 28, 2018, at the same Super 8 Motel in Metairie where he previously had a "date" with M.B.[9] Ms. Scala was arrested for prostitution on that date. Photographs of condoms, pills, a crack pipe, and a blunt located inside of the motel room were admitted into evidence. Detective Donahue was a covering officer at the scene, and confirmed that Ms. Scala was dropped off for the date by a white Lincoln MKZ.[10] He stated that the vehicle was located at the InTown Suites nearby. The vehicle was stopped, and Mr. Diaz was the driver. Detective Donahue testified that Mr. Diaz had two active arrest warrants for the trafficking of children for sexual purposes and for pandering, and was arrested at that time. Several cell phones and a social security card for Kenneth Cantrell were located inside of Mr. Diaz's vehicle. Detective Donahue found a BB gun in a blue backpack located inside of the trunk.

---

[9] Sergeant Olivier explained that on this occasion, JPSO made prior arrangements with management for the Super 8 Motel to use a hotel room as a part of its investigation. Thus, the "date" with Ms. Scala was set up as an "out-call date" since she came to the client.

[10] On cross-examination, Detective Donahue conceded that he did not personally see Ms. Scala being dropped off by a white Lincoln MKZ, but that it was observed by another covering officer involved in the investigation.

### *Caitlyn Drunkenmiller*

Caitlyn Druckenmiller told the jury that she was 30 years old and currently incarcerated in Indiana for a "level six theft."[11] She testified that she met Mr. Diaz in the summer of 2017 while living in Kenner and working as a prostitute. He "hit her up" through an advertisement she had posted on her Backpage.com account, which she set up in 2016 or 2017. They met, had sex, and he gave her some money. Several months later, Mr. Diaz contacted her again and told her he had someone working with him and he wanted her to work with him, too, which she believed meant that Mr. Diaz wanted them "to make some money," but she was not interested. She testified that Mr. Diaz continued to contact her telling her things, which led her to believe that he really liked her and that "it was going to be more than money … like a relationship" between the two. Because she had a falling out with her boyfriend, she decided to go with Mr. Diaz and M.B. to a hotel before returning home.[12] She ended up with them again at the Super 8 Motel and then the InTown Suites following another fight with her boyfriend.

Ms. Druckenmiller told the jury that she would not have agreed to go with Mr. Diaz if she had not believed that a relationship with him would occur. However, instead of a relationship, it turned out to be "all about money," which involved posting ads on Backpage.com, getting high, and having sex with strangers for money. She confirmed that she, M.B., and Michelle Scala, who allegedly grew up with Mr. Diaz and was a heavy drug user, engaged in these activities. Ms. Druckenmiller described M.B. as innocent and "very naïve to the situation." She stated that, because neither Mr. Diaz, M.B., nor Ms. Scala had their own

---

[11]     Ms. Druckenmiller confirmed that she had other convictions in Kentucky as well, including stolen property and drug charges, to which she pled guilty, that occurred prior to her involvement with Mr. Diaz. Additionally, in 2018, she pled guilty to charges for simple burglary and the unauthorized use of a motor vehicle.

[12]     Ms. Druckenmiller admitted that she had previously been living at the InTown Suites prior to having moved into a house.

Backpage.com accounts, advertisements for their "dates" were posted through her account.[13] She explained that Mr. Diaz initially gave her drugs in exchange for posting ads for M.B. and Ms. Scala using her Backpage.com account, but at some point, she lost access to it because Mr. Diaz took over the account by changing her password. She stated that she contacted Mr. Diaz on several occasions concerning her account, but he refused to respond.[14]

Ms. Druckenmiller testified that Mr. Diaz told her not to teach M.B. or Ms. Scala how to use Backpage.com. She explained that Mr. Diaz would have her post advertisements for M.B. and Ms. Scala, and that when a "potential John" contacted the number listed, he would reply via text messaging to set up the "date." If a potential client would call in response to an ad rather than text, Mr. Diaz would hand the phone to her, M.B., or Ms. Scala, accordingly. She testified that Mr. Diaz would rent the hotel room for their "in call" dates, and transport them to and from any "out call" dates because none of them had cars. She initially described Mr. Diaz's vehicle as a "newer white or silver" vehicle, but then stated that she did not know what kind of car it was. Ms. Druckenmiller testified she did not remember doing "car visits" with Mr. Diaz, but stated that when she had a car date, she would have the client pick her up and then drop her back off.

Ms. Druckenmiller testified that Mr. Diaz told her that M.B. was 19 years old. She expressed that she was scared for M.B. because M.B. looked so young. She claimed that she provided M.B. with lingerie and did her makeup. She noticed that Mr. Diaz held all of M.B.'s money, which concerned her, and that as soon as she was able to get M.B. alone, she advised her against letting him do so. After

---

[13] Ms. Druckenmiller confirmed that the email she used for the account was "C.Drunkenmiller@yahoo.com."

[14] According to Ms. Druckenmiller, even though Mr. Diaz had effectively locked her out of her own Backpage.com account, she had enough "regulars" that she did not need to personally post ads for herself. She admitted that, when asked by Mr. Diaz, she posted ads on her Backpage.com account for other females in Louisiana and Mississippi.

Mr. Diaz learned of this, Ms. Druckenmiller was not ever again allowed to be alone with M.B. She had no knowledge about Ms. Scala's money. She claimed that she provided Mr. Diaz with money to help pay for the hotel while she was with him. She recalled that Mr. Diaz kept a gun in his vehicle, which he claimed was for "in case something happened." He told her that she was lucky to know him because he and his friend would "pick up girls off Backpage to rob them."

Ms. Druckenmiller testified that on February 8, 2018, she had a "car date," which led to her arrest.[15] She explained that after being dropped off by a client from a previous "car date," she met with an individual, who turned out to be an undercover officer, down the street from her home. She stated that she cooperated with law enforcement and provided specific information regarding Mr. Diaz, M.B., and Ms. Scala, including how Mr. Diaz recruited her, how he transported her and other women to "out calls" and to hotels, how she was isolated from M.B., and how Mr. Diaz provided for her by giving her a hotel room to stay in and drugs in exchange for her posting ads for him. Additionally, she identified Mr. Diaz and M.B. in photographic lineups, and identified Mr. Diaz's moniker on Facebook as "Miss Understood." She also identified a Backpage.com ad of M.B. Although she could not recall whether she or Mr. Diaz had posted the particular ad, she noted that Mr. Diaz provided her with photographs of M.B. that she posted on her Backpage.com account. Ms. Druckenmiller testified that she pled guilty to prostitution, and she continued to cooperate with law enforcement in regards to Ms. Scala. She specifically identified Mr. Diaz in open court.

### Special Agent Jennifer Terry

Special Agent Jennifer Terry, who has been working human sex trafficking cases for the FBI since 2009, testified that children under the age of 18 are

---

[15] Ms. Druckenmiller admitted to having previously been arrested in Jefferson Parish at a "Brother's by Intown."

automatically—without force, fraud, or coercion—considered victims of sex trafficking because they are unable to consent. She stated that the FBI, with the assistance of the Louisiana State Police, came into contact with the victim, M.B., on February 1, 2018. She explained that the FBI had established a "human trafficking recovery operation" and set up an undercover operation at a hotel in New Orleans. She testified that the FBI searched "predicted websites" where pimps and traffickers post prostitution advertisements, and then the FBI would contact the numbers listed on the ads to try and solicit the prostitutes or victims to come to the undercover hotel. In M.B.'s case, the undercover hotel was the Homewood Suites located on Rampart Street near the French Quarter.

Special Agent Terry testified that an undercover agent arranged the prostitution date with M.B. and actually met her in the lobby of the hotel prior to taking her to the room. Once a verbal agreement for sex in exchange for money occurred between M.B. and the undercover agent, other law enforcement agents entered the room. A black Huwei cell phone and two Trojan condoms were seized from M.B. Special Agent Terry explained that she was not one of the agents that went into the room, but rather, she was in the interview room and conducted the initial interview with M.B. upon her recovery. She described M.B. as being scared and only willing to provide minimal information, including that she was 17 years old. Although M.B. would not reveal the name of her trafficker, Special Agent Terry testified that the minimal information M.B. did provide was enough to confirm for her that M.B. was a victim of human trafficking. She stated it is not uncommon for victims to withhold the name of their trafficker. On the night M.B. was recovered, the FBI contacted a local non-profit organization, who made temporary arrangements for her to stay at a hotel in Baton Rouge. M.B. was assigned a social worker for counseling.

Special Agent Terry testified that after M.B. was transferred to a long-term facility for victims of human trafficking, she was able to conduct a second interview with M.B. On February 16, 2018, Special Agent Terry and another detective met with M.B. and showed her several photographic lineups. From these, M.B. identified Mr. Diaz, Caitlyn Druckenmiller, and Mr. Diaz's white Lincoln MKZ. M.B. disclosed to Special Agent Terry that she had been arrested in Jefferson Parish a few weeks prior, so the FBI reached out to Sergeant Lacascio with the JPSO Vice Squad to exchange information. She was able to confirm M.B.'s January 23, 2018 arrest. Sergeant Lacascio advised Special Agent Terry that during JPSO's operation, they had gone to a hotel, conducted an "in-call date," and recovered M.B. Sergeant Lacascio advised that JPSO also learned that the hotel room had been registered to and paid for by Jared Diaz, and that there was a Lincoln MKZ associated with Mr. Diaz. Using this information, the FBI agents pulled video surveillance footage from the area surrounding the Homewood Suites and were able to determine that there was a Lincoln MKZ in the area at the time of M.B.'s date with the undercover agent.[16]

Special Agent Terry testified that in connection with the FBI investigation, her co-agent, Agent Justin Berry, issued a subpoena *duces tecum* to Backpage.com, and that the return included the advertisements featuring M.B. on the website. She testified that further into the investigation, the FBI learned that M.B. had been

---

[16] Special Agent Terry explained that there were three videos located on the disc, which were admitted into evidence at trial that corresponded with different street cameras located at Bourbon and Conti, Bourbon and St. Louis, and Canal and Bourbon. She testified that in a video labeled "Bourbon and Conti," a Lincoln MKZ could be seen crossing Bourbon Street near the Homewood Suites on Rampart. She confirmed that it was common for a trafficker to remain in the area when a prostitute heads out to calls. Next, she testified that the video labeled "Bourbon and St. Louis" also revealed the vehicle and that a driver could be seen. She noted that it appeared that a passenger was inside of the vehicle, but that the driver and passenger could not be identified. In the third video, she confirmed that she was able to locate the white Lincoln MKZ in the area of Canal and Bourbon at the time of the undercover instigation with M.B. On cross-examination, Special Agent Terry testified that she was unable to obtain a copy of the video surveillance from the Homewood Suites before the hotel manager died suddenly. She testified that she was, however, able to previously view the video. She recalled observing a white Lincoln MKZ pulling off onto a side street of the hotel, and M.B. walking around the corner into the hotel. She stated that M.B. was dropped off by the white Lincoln MKZ.

recruited to prostitution by an individual through Facebook, who was using the moniker, "Miss Understood." She pointed out that in one of the advertisements, the individual listed the Facebook "Miss Understood" account as the point of contact to book a prostitution date. She testified that the FBI learned that the Facebook account belonged to defendant, Jared Diaz. She testified that the FBI also learned that the account used to create the Backpage.com advertisements for M.B. had an email address belonging to Caitlyn Druckenmiller.[17] The FBI eventually applied for a search warrant for the account and verified that it belonged to Ms. Druckenmiller.

Special Agent Terry testified that in her interview with M.B. in February 2018, M.B. disclosed that she and Mr. Diaz moved around from hotel to hotel in Jefferson Parish, staying only one or two nights at a time, in order to avoid suspicion by hotel employees and hotel management. Based on this information, Special Agent Terry stated that she was able to obtain hotel registration information for various hotels in the area and discovered that from October 10, 2017, through January 23, 2018, the date of M.B.'s arrest and recovery by JPSO, Mr. Diaz had registered and paid in cash for 14 different rooms in four different hotels located in Jefferson Parish, and generally for only one or two nights at a time.[18] The registration forms frequently listed a white Lincoln MKZ associated with the different rooms, which she confirmed was the same vehicle identified in the video surveillance footage obtained by the FBI on the night M.B. was recovered at the Homewood Suites in New Orleans.

Special Agent Terry testified that she confirmed that Mr. Diaz was the owner of the Huawei cell phone seized by the FBI from M.B. on February 1, 2018.

---

[17] Special Agent Terry explained that an email address is required to set up the Backpage.com advertisements, in order to pay for the advertisements, obtain receipts, and other information.

[18] Hotel registration information obtained from Econolodge, InTown Suites, LaQuinta Hotel, and Super 8 Motel was introduced into evidence.

She stated that she applied for a search warrant for the phone, and that the phone records showed numerous texts for potential prostitution dates, including texts exchanged with the FBI's undercover agent. She testified that Mr. Diaz's phone contained images depicting large amounts of cash, flashy jewelry, which she explained are images typically found on a pimp's phone. Photos of Caitlyn Druckenmiller, saved in a folder called, "Caitlyn," created on January 14, 2018, and which were used in prostitution advertisements, were also contained on the phone. Special Agent Terry testified images of M.B. that were used in multiple prostitution advertisements, including advertisements on Backpage.com, were also found on the phone. She described two nude photographs saved under a folder in M.B.'s first name. She testified that these nude photos of M.B. on Mr. Diaz's phone were of particular interest to the FBI because M.B. was a minor, and because it is common when arranging a prostitution date, that nude photographs are sent between the pimp and the potential date as part of the negotiation pattern.

According to Special Agent Terry, there were other text messages found on Mr. Diaz's phone that were suggestive of sex trafficking, including messages containing price quotes and requesting the cost of the "donation." She explained prostitutes often use the term "donation" as a safeguard against law enforcement to show that they are not actually charging for their services. Mr. Diaz' phone also contained messages asking whether the person texting was involved in law enforcement, which is also indicative of prostitution because there is a misconception that law enforcement, when asked, has to identify themselves. Other text messages on his phone referenced the availability for an "in call or an out call," which Special Agent Terry explained are common prostitution terms.

Special Agent Terry testified that Mr. Diaz's phone also contained several messages involving Caitlyn Druckenmiller related to her Backpage.com account. In particular, she located the text messages that corroborated Ms. Druckenmiller's

testimony that she had unsuccessfully tried to gain access to her Backpage.com account, and sent text messages to Mr. Diaz requesting the password to which he did not respond.

According to Special Agent Terry, she applied for a search warrant to Facebook for both Mr. Diaz's "Miss Understood" account and M.B.'s account. She explained that M.B. had been recruited into prostitution through this account in 2017 when she was 16 years old, and that the first advertisement for M.B. was posted in December 2017. She was able to confirm that the Facebook account for "Miss Understood" was registered to a backup email address, Diaz1198@yahoo.com, and the "vanity name" for the account was "Diaz504."[19] She stated that Mr. Diaz and M.B. would message one another through Facebook, and she was able to confirm these conversations between the accounts. Special Agent Terry testified that she was also able to locate photographs on Mr. Diaz's account of his Lincoln MKZ.

Special Agent Terry testified that during her search of Facebook, she uncovered information that further connected Mr. Diaz and M.B. to the January 2018 arrest by JPSO. Specifically, she testified that there were messages from the date M.B. was arrested, and that on January 24, 2018, Mr. Diaz sent a message to M.B. asking, "where you at?" Special Agent Terry relayed that M.B. replied, "I got arrested. I'm out now. I need you to come get me." Special Agent Terry testified that she reviewed messages in which M.B. discussed a prostitution date, and discussed evading the police. She relayed that there were messages wherein M.B. asked to be picked up from a date, and where Mr. Diaz asked if M.B was finished. She confirmed that this was consistent with the relationship between

---

[19] Special Agent Terry testified that she was able to confirm that Mr. Diaz used this account through one of the messages he sent on Facebook Messenger wherein he identified himself by name and wrote that he was the son of Deborah Diaz.

M.B. and Mr. Diaz. She testified that Mr. Diaz brought M.B. with him wherever he went, drove her to all of her "out calls," and then they stayed together at the same hotels. She also explained that although M.B. did have a personal phone, her service had been turned off. When the two were apart, M.B. and Mr. Diaz would primarily communicate through Facebook Messenger.

Special Agent Terry testified that M.B. was operating under the belief that she was in a relationship with Mr. Diaz. She explained that this was a "typical pimp/prostitute relationship or recruiting mechanism." She testified that an individual will be told that they need to go out and earn money for the two of them to survive. She stated the relationship slowly evolves into a more controlling situation with threats or violence. She testified that she learned M.B.'s date of birth was January 2, 2001. She confirmed that at the time of the investigation on February 1, 2018, M.B. was being trafficked and was under the age of eighteen.

### *Lieutenant William Hare*

JPSO Lieutenant William Hare, commander of the Vice Division, was qualified as an expert in the area of human trafficking. He described human trafficking as a "pimp/prostitute" relationship, where the prostitute is generally under the control of the pimp. He explained that it occurs when a person is forced to do something against his or her will in order for the trafficker to make a profit off of the other. He noted that the "force" employed does not have to be physical and could include coercion or fraud. Lieutenant Hare explained that in trafficking, there are specific stages, which include: the recruiting stage; the seduction stage; the isolation stage; the coercion and violent stage; the non-romantic/non-relationship stage; the reframing stage; and the grooming stage. He testified that human trafficking occurs on certain websites used by traffickers to advertise their product, *i.e.*, a girl, with prices available. He described a typical victim of human trafficking as one who comes from a broken home, has no place to go, has low

self-esteem, and may or may not have been sexually abused in the past and is seeking to get out of that situation. Traffickers tend to seek out younger females because they are more vulnerable and generally have no knowledge of a relationship with a man.

Lieutenant Hare testified that he was familiar with Backpage.com and that the JPSO Vice Division made numerous cases regarding prostitution and human trafficking from the site. He explained that in some cases, the pimp takes charge of management, including putting the hotel rooms in his name, answering phone calls and text messages, and keeping track of the location of the women he pimps. He further explained the different types of dates, including "out call dates," "in call dates," and "car dates."[20] According to Lieutenant Hare, prostitution dates usually occur in a hotel room, paid for in cash, and one night at a time in order that they can leave quickly in the event law enforcement are in the area. He stated that the pimp generally stays close by so that he can keep his eye on the victim, to ensure that she does not escape or that violence is not done to her, and to monitor for police. He testified that a pimp typically transports the victim in order that he can maintain control over her. He described that "tools of the trade" are usually found in the hotel rooms, which include lubricant, condoms, used wash cloths, and hand towels. He stated that cash is often not found on the prostitutes because the pimp generally controls the money.

Lieutenant Hare testified that victims of human sex trafficking rarely cooperate with the police. He stated that he reviewed all of the police reports in regard to Mr. Diaz's investigation and concluded that the evidence in this case is

---

[20] He confirmed that "out calls" occur when the girl goes to the client; "in calls" occur when the client meets the girl at hotel room; and "car dates" occur when the girl meets a person somewhere and the date occurs inside of the vehicle.

consistent with Mr. Diaz using M.B. for purposes of engaging in commercial sexual activity.

*__Testimony of the victim, M.B.__*

M.B., who was 19 years old at the time of trial, testified that she was born on January 2, 2001. She stated that she came to Louisiana when she was 13 years old, moved back to live with her father in Michigan, and returned to Louisiana when she was 15, where she lived with her mother in Slidell. When she turned 16, she moved in with her grandmother in Mandeville, but when the situation became too overwhelming for her grandmother, she was kicked out, with no place to go.

M.B. testified that she met Jared Diaz on social media prior to being kicked out. Although she was only 16 years old when she met him, she told Mr. Diaz that she was over 18 because she was homeless, and she did not think someone her own age would be able to help her. M.B. stated that when she was kicked out of her grandmother's house, she called Mr. Diaz for help and he came. She testified that Mr. Diaz initially took her to his father's house, but then they went to different hotels, including the Super 8 Motel, LaQuinta, and other neighboring hotels. The hotel rooms were always rented and paid for by Mr. Diaz. She explained that when Mr. Diaz first came to get her, she believed their relationship was a friendship. She stated that prior to meeting Mr. Diaz, she had never had sex in exchange for money—this only occurred after she began going to hotels with Mr. Diaz. She testified that her having sex with strangers in exchange for money began when she was 16 years old, and ended just before her 17th birthday.

M.B. stated that Mr. Diaz taught her "how to call." When someone would call for a date, Mr. Diaz directed her as to what she was to say, what price to ask, and on "every call you make ask them if they're law enforcement." M.B. testified that Mr. Diaz posted her ads on Backpage, com, set up her dates, and took pictures

of her for the ads.[21]  She confirmed that when someone would text her to set up a date, Mr. Diaz would respond—he would not allow her to text.

M.B. testified that she did not have a car so Mr. Diaz transported her in his white Lincoln when she met "johns" at other locations.  She stated that Mr. Diaz did not stay in the hotel room with her during the dates, and she denied knowing where he was during those times.  Mr. Diaz instructed her to set a timer for the prostitution dates for whatever time he had previously negotiated, and to call him when she was done.  He directed her to put the money in the bathroom, and this is what she did.  After she was done, Mr. Diaz came to pick her up and he retrieved the money.  She stated that she gave all of the money she made from the prostitution dates to Mr. Diaz—he never allowed her to keep even a dollar.  She testified that she was not allowed to deviate from any of the plans or rules.

M.B. claimed that in the beginning, she thought that maybe she could leave, but this changed.  She claimed that Mr. Diaz became "verbally violent" and threatened that he would kill her and throw her in a river where no one would be able to find her.  Mr. Diaz also told her that he knew where her mother lived and that if she ever tried to run away, if he could not get to her, he would get to her mother.  M.B. testified that when things reached this point, she did not believe she could leave or run away.  She testified that neither her mother nor her friends were ever allowed to come visit her at any of the hotels.  According to M.B., in all of the time that she was with Mr. Diaz, she was only away from him for one night when she went to stay with her mother.  She testified that she did not tell her mother what she was doing out of fear of Mr. Diaz.

M.B. testified that she met Ms. Druckenmiller and Ms. Scala while with Mr. Diaz, and they gave her advice on what to do.  Specifically, they advised her to

---

[21] M.B. testified that she occasionally took pictures of herself for the ads that Mr. Diaz posted.

keep her tips rather than give them to Mr. Diaz. She recalled Ms. Druckenmiller helping her with her hair. She claimed that Mr. Diaz would take them to the mall so that they could recruit other girls to go with them to the hotels to "take calls and to do … the same thing [they] were doing." M.B. testified that she began doing cocaine and pills only after meeting Mr. Diaz.

M.B. confirmed that Mr. Diaz carried a pistol in the trunk of his car, which she discovered when Mr. Diaz and his friend, "Smoke," took her to the LaQuinta hotel in Kenner so that they could rob a girl that Mr. Diaz had set up a date with online.[22] At Mr. Diaz's direction, M.B. drove the car after he and Smoke completed the robbery. She testified that Mr. Diaz robbed "dates" on more than one occasion, sometimes alone and sometimes with Smoke. She stated that Mr. Diaz, who, by this time, knew she was not 18 years old, wanted her to get a fake I.D. so that she could buy guns for him.

M.B. testified that she was arrested on January 23, 2018, by the JPSO when she was 17 years old. Mr. Diaz set up the date for her with the undercover officer and rented room 235 at the Super 8 Motel. She confirmed that the "john" gave her money, and that she put it in the bathroom. After she was arrested, she did not tell the officers about Mr. Diaz because she was trying to protect him. She explained that after leaving jail the following morning, she contacted Mr. Diaz because "he was the only person [she] had."[23] She testified that when he came to get her, they drove to a Baton Rouge motel located next to a bowling alley, where Mr. Diaz had set up a date for her. She stated that they went to Baton Rouge because they were scared the police were watching for them in Jefferson Parish. However, when she was in the hotel waiting for her date, Mr. Diaz messaged her not to open the door

---

[22]     M.B. described "Smoke" as an "African-American, kind of husky, low haircut."

[23]     M.B. explained that she used Facebook to communicate with Mr. Diaz, and confirmed that his moniker on Facebook was "Miss Understood."

because police were outside. M.B. stated that she got dressed and ran out of the hotel to the bowling alley, where Mr. Diaz picked her up.

M.B. testified that after eventually returning to Jefferson Parish, Mr. Diaz set up an "out call date" for her on February 1, 2018, at the Homewood Suites. He drove her to the hotel in his Lincoln, and dropped her off. She said that she took his phone with her on the date because she needed to maintain text messages with the "john," who turned out to be an undercover FBI officer. She claimed that she provided a statement to the FBI, but still refused to give them Mr. Diaz's name because she was trying to protect him. The FBI arranged for her to go to a safe house in Baton Rouge. She admitted that while there, she continued communicating with Mr. Diaz, and that he came to visit her. She stated that he "showed affection towards [her]" because "it would look good if someone was watching [them]."

M.B. testified that she later agreed to cooperate with the FBI and spoke with Special Agent Jennifer Terry. She identified Mr. Diaz, his Lincoln MKZ, and Ms. Druckenmiller in photographs the FBI showed to her.[24] She stated that the vehicle she identified was the same vehicle Mr. Diaz used to transport her to dates, to take her to Baton Rouge, and to drop her off in the French Quarter on February 1, 2018, and was the same vehicle that Mr. Diaz used to transport Ms. Scala and Ms. Druckenmiller. M.B. also identified Mr. Diaz in a photographic lineup that she viewed with the JPSO and the FBI, as well as her ads from Backpage.com that JPSO presented to her. She explained that Mr. Diaz took the photographs of her, and he posted the ads on Backpage.com in order for clients to potentially contact her for sex. M.B. identified Mr. Diaz in open court as the man she met when she

---

[24] M.B. also identified an ad of Ms. Druckenmiller, an ad of herself, and a photograph of Ms. Scala, all of which were admitted into evidence.

was 16 years old and who was responsible for setting up dates for her to have sex with men in exchange for sex until she was 17 years old.[25]

During his case in chief, Mr. Diaz called the following witnesses in support of his defense: Michelle Scala, Sergeant Michael Olivier, Deputy Ian Donahue, Sergeant Solomon Burke, and the victim, M.B.

## *Michelle Scala*

Ms. Scala confirmed that she had previously been arrested in Jefferson Parish for drug possession, prostitution, and theft, including an arrest over a year ago at the Super 8 Motel. She testified that, at the time, she was in "active addiction," using heroin, pills, and cocaine, and living a "selfish life." She told JPSO officers that she met Mr. Diaz through a friend, and that she and Mr. Diaz were friends. She claimed that she would call him for rides to go "get stuff," and when she needed help to get away from an abusive relationship. She denied feeling threatened, coerced, or forced to engage in prostitution for him—Mr. Diaz was not her "pimp"—or that she ever gave him money. She testified she "kept [her] own money" and "used to do [her]own thing, individually."

Regarding M.B., Ms. Scala testified that she knew M.B. through drug use, prostitution, hotels, and from "other places," but denied knowing her very well. She stated that M.B. was always wanting to be around, that M.B. used drugs, and that M.B. told her she was a prostitute. Although Ms. Scala denied knowing exactly how old M.B. was at the time, she testified that M.B. lied about her age. She described Mr. Diaz and M.B. as having been in a dating relationship, and denied that he was M.B.'s "pimp." She recalled that Mr. Diaz would drive M.B.

---

[25] On cross-examination, M.B. admitted that her Facebook page indicated that her birthdate was January 2, 1986, which was incorrect. She claimed that she lied about her birthdate because one had to be eighteen years old to make a Facebook page.

back and forth to M.B.'s mother's home in Metairie, and to other places because, like herself, M.B. did not have a vehicle.

On cross-examination, Ms. Scala denied that Mr. Diaz ever dropped her off at the Super 8 Motel, even when confronted with a call Mr. Diaz made to his sister from jail, during which he told his sister that he had dropped off a friend at a hotel.

### Sergeant Michael Olivier

Sergeant Olivier testified during the defense's case that Mr. Diaz and Ms. Scala were both arrested on February 8 or 9, 2018. He confirmed that he was familiar with Ms. Druckenmiller, and confirmed that she was the account holder of the advertisement that he contacted to set up a date. Sergeant Olivier explained that the Backpage.com account could be controlled through a cell phone, computer, or any electronic device with internet access.

### Detective Ian Donahue

Detective Donahue was also called by the defense to testify. He stated that he was familiar with the arrests of Ms. Druckenmiller and Ms. Scala. He testified that Mr. Diaz transported Ms. Scala in his white Lincoln to the Super 8 Motel and that another covering officer, whose name he was unable to provide, observed this. The detective explained that the information about Mr. Diaz's vehicle was relayed over radio between officers, but was not recorded.

### Sergeant Solomon Burk

The parties stipulated that Sergeant Solomon Burk, the commander of the JPSO Digital Forensic Unit, was an expert in the field of mobile device forensics. He confirmed that he was asked to download information from the cell phones seized in this matter, and stated that he placed the extraction on a disc that was admitted into evidence. On cross-examination, Sergeant Burke testified that depending upon how a cell phone is set up, whether or not it is locked or unlocked, whether messages are being transmitted via cellular signals or data, and the varying

messaging apps being used, he is not always able to download all of the messaging information from every cell phone recovered in every case. He stated that in this case, he was extracting information from an iPhone, which contained messages exchanged through certain text applications. He explained that some of the messages through the text apps may not be actual outgoing texts and could be incoming texts. He also explained that a cell phone extraction cannot determine the actual user of the phone.

### *M.B.*

The defense called M.B., who confirmed that prior to meeting Mr. Diaz in 2017, the only drug she used was marijuana. She testified that she was in possession of a "white rose gold iPhone" when she was arrested in Jefferson Parish, a phone that Mr. Diaz used. When asked about a text message that referred to a "girl," M.B. explained that "girl" meant cocaine. M.B. denied that she ever contacted any of her friends for a place to go for prostitution, or that a family member "begged" her to come home so she could continue school. M.B. also denied that, prior to meeting Mr. Diaz, she had ever solicited anyone for sex, gone to hotels with random men, perform a strip show for men, or made a video for sex. She stated the only reason she ran away with Mr. Diaz, a man she did not know, was because she had nowhere else to go.[26]

On cross-examination, M.B. testified that she thought she met Mr. Diaz on Facebook, but could not specifically recall the exact social media outlet on which they connected. She stated that she also had his number and that they would sometimes talk on the phone. After reviewing the extraction downloaded from her phone, M. B. testified that there were several texts that she did not send, and

---

[26] Mr. Diaz attempted to have M.B. read from a laptop, a series of text messages that were downloaded from her cell phone onto a computer disc. His court appointed shadow counsel, Ms. Bourg, requested that Mr. Diaz be allowed to publish the information on the laptop that he using during his questioning, which the trial court allowed. However, when Mr. Diaz failed to pose an actual question to M.B., the State lodged an objection, which the court sustained.

explained that Mr. Diaz usually had access or possession of her phone when she was with him, and that he would send text messages to persons she did not know. M. B. denied that Ms. Druckenmiller or Ms. Scala had similar access or possession of her phone.

### *Detective James N. Guidry*

On rebuttal, the State called Detective James N. Guidry with the JPSO Office Criminal Intelligence Division, who testified that a program called Securus is used for jail house calls. He testified that all such calls are monitored and recorded, and cannot be manipulated in any manner. He explained that each inmate is given a PIN number that is used to make calls from the jail, and that at the beginning of each call, the inmate or user is notified that the call may be monitored or recorded. Detective Guidry stated that in this particular case, he downloaded onto a disc a jail call that was recorded on March 2, 2018, and provided the State with a copy, along with the corresponding paperwork. He explained that the call was placed from Mr. Diaz's PIN number/account to a number identified as belonging to Candace Diaz, Mr. Diaz's sister. Detective Guidry confirmed that during the call, which occurred after Mr. Diaz was arrested in the instant case, Candace referenced the caller by "Jared." In the call, the caller stated that he did not know what was going on (why he was arrested), because he was only giving his "friend a ride" to a hotel, and that "they" have been watching her because she's prostituting, and "they" think that he is her pimp.

### LAW AND ANALYSIS

On appeal, Mr. Diaz argues one counseled error and five *pro se* assignments of error. Specifically, in his counseled assignment of error, and his *pro se* assignment of error number four, Mr. Diaz argues the 65-year sentence imposed by the trial court is constitutionally excessive. In his remaining four *pro se* assignments of error, Mr. Diaz argues (1) the trial court erred in admitting evidence

of prior bad acts under La. C.E. art. 404(B); (2) the trial court erred in failing to grant his motion for new trial; (3) the trial court erred in failing to address his *Brady* claim violation; and (5) ineffective assistance of counsel.

## *Constitutionally Excessive Sentence*

Defense counsel and Mr. Diaz challenge his 65-year enhanced sentence—which they contend amounts to a life sentence for 30-year old Mr. Diaz—as constitutionally excessive.

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Article I, § 20 of the Louisiana Constitution also prohibits cruel and unusual punishment, but further explicitly prohibits excessive punishment. A sentence is considered excessive, even when it is within the applicable statutory range, "if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime." *State v. Dixon*, 17-422 (La. App. 5 Cir. 3/14/18), 241 So.3d 514, 523, *writ denied*, 18-542 (La. 2/11/19), 263 So.3d 415. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is disproportionate as to shock the court's sense of justice. *State v. Shaw*, 12-686 (La. App. 5 Cir. 1/16/13), 108 So.3d 1189, 1195.

A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and therefore, is given broad discretion when imposing a sentence. *State v. Warmack*, 07-311 (La. App. 5 Cir. 11/27/07), 973 So.2d 104, 109. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. *State v. Dorsey*, 07-67 (La. App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130, *writ denied*, 08-1649 (La. 4/17/09), 6 So.3d 786. The review of sentences

under La. Const. art. 1, § 20 does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is most appropriate in a given case. *State v. Williams*, 07-1111 (La. 12/7/07), 969 So.2d 1251, 1252 (*per curiam*).

The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); *State v. Pearson*, 07-332 (La. App. 5. Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a trial court's sentencing discretion, the reviewing court should consider the nature of the crime, the nature and background of the offender, and the sentence imposed for similar crimes by the same court and other courts. *Id*. at 656. However, there is no requirement that specific matters be given any particular weight at sentencing. *State v. Tracy*, 02-227 (La App. 5 Cir. 10/29/02), 831 So.2d 503, 516, *writ denied*, 02-2900 (La. 4/4/03), 840 So.2d 1213. Generally maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. *State v. Melgar*, 19-540 (La. App. 5 Cir. 4/30/20), 296 So.3d 1107, 1115, *writ not considered*, 20-1199 (La. 3/9/21), 312 So.3d 267.

When determining the sentence to be imposed, a trial judge is not limited to considering only a defendant's prior convictions, but may properly review all prior criminal activity. *State v. Arceneaux*, 19-472 (La. App. 5 Cir. 1/29/20), 290 So.3d 313, 316, *writ denied*, 20-324 (La. 5/14/20), 296 So.3d 608. The sentencing court may rely on sources of information usually excluded from the courtroom at the trial of guilt or innocence, *e.g.*, hearsay and arrests, as well as conviction records. *Id*.; *See also State v. Myles*, 94-217 (La. 6/3/94), 638 So.2d 218, 219. These matters may be considered even in the absence of proof the defendant committed the other offense. *Arceneaux*, 290 So.3d at 316.

In the instant case, Mr. Diaz was convicted of trafficking of children for sexual purposes, a crime of violence, and was originally sentenced to 50 years at

hard labor, the maximum sentence for this offense.[27]  Mr. Diaz was later

adjudicated a second felony offender.  On the same day of his adjudication, his

original sentence was vacated, and the trial court sentenced him as a multiple

offender to 65 years imprisonment at hard labor to be served in the Department of

Corrections, without benefit of probation or suspension of sentence.

Defense counsel contends that prior to Mr. Diaz electing to go to trial, the

court relayed an offer of a plea bargain in exchange for a 15-year sentence, the

minimum mandatory sentence, but then later imposed the maximum sentence of 50

years, which the court vacated in order to impose the enhanced 65-year sentence.

Although defense counsel concedes that the sentence imposed falls within the

statutory sentencing range, counsel argues that for Mr. Diaz, at 30 years of age, it

is essentially a life sentence.  Defense counsel contends that Mr. Diaz's prior

conviction on the habitual offender bill was for distribution of marijuana, a non-

violent drug offense, that occurred when he was 24 years old, and that the trial

court did not have the "benefit of a pre-sentence investigation ['PSI'] to adequately

consider the nature of the offender and whether he was the worse type of offender

to justify the exorbitant sentence for his offense."  Consequently, defense counsel

argues Mr. Diaz's sentence should be vacated as constitutionally excessive.

In response, the State contends that the record supports the sentence imposed

and that the enhanced sentence is within the applicable sentencing ranges.

Specifically, the State argues the trial court did not abuse its broad sentencing

discretion because Mr. Diaz's 65-year sentence is considerably lower than the

---

[27]      The penalty provisions for trafficking children for sexual purposes found in La. R.S. 14:46.3 provide for that "[w]hoever violates the provisions of Paragraph (A)(1), (2), (4), (5), or (6) of this section shall be fined not more than fifty thousand dollars, imprisoned at hard labor for not less than fifteen, nor more than fifty years, or both."

maximum sentence of 100 years,[28] and does not impose a needless infliction of pain and suffering. The State contends that Mr. Diaz's criminal history as a second felony offender and the particular circumstances of this case do not warrant imposition of a lesser sentence. The State maintains that Mr. Diaz's contention that his sentence is excessive because the trial court, prior to trial, proposed a sentence of 15 years in exchange for a guilty plea lacks merit as the record and facts presented at trial support the 65-year enhanced sentence. The State asserts the trial court did consider Mr. Diaz's prior non-violent criminal history, but determined that his acceleration to a violent sex crime makes Mr. Diaz the type of offender the habitual offender statute was created to punish. We agree.

At the outset, we note that if a trial judge has agreed to impose a particular sentence pursuant to a plea bargain, this does not restrict that judge from imposing a more severe sentence if the defendant elects to go to trial and is convicted. *See. State v. Aleman*, 01-743 (La. App. 5 Cir. 1/5/02), 809 So.2d 1056, 1066-67, *writ denied*, 02-481 (La. 3/14/03), 839 So.2d 26. In this case, Mr. Diaz, chose to proceed to trial. Thus, we find no merit to the contention that a proposed 15-year pre-trial plea bargain supports a finding that Mr. Diaz's enhanced sentence in this case is constitutionally excessive.

Once Mr. Diaz was adjudicated a multiple felony offender and his original 50-year maximum sentence was vacated, under La. R.S. 15:529.1(A)(1), Mr. Diaz faced a maximum sentence of 100 years at hard labor without benefit of probation or suspension of sentence. The 65-year enhanced sentence imposed upon Mr. Diaz clearly falls within the statutory range. Nonetheless, we must determine whether

---

[28] The penalty for being a second felony offender found at La. R.S. 15:529.1(A)(1), provides that "[i]f the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-third the longest term and not more than twice the longest term prescribed for a first conviction." Thus, the sentencing range Mr. Diaz was facing was 16.67 years to 100 years. His 65-year sentence is within mid-range of the statutory guidelines provided by the Legislature.

the imposition of this sentence that falls within the statutory limits violates Mr. Diaz's constitutional right against excessive punishment. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So.2d 1, 4. In doing so, we must consider the nature of the crime, the nature and background of Mr. Diaz, and the sentences imposed for similar crimes by this court and other courts. *See Allen*, *supra*, 868 So.2d at 880.

Undoubtedly, the nature of the crime committed by Mr. Diaz—trafficking of children for sexual purposes—is heinous and of a serious nature. The testimony and evidence presented at trial established that Mr. Diaz preyed upon and took advantage of a young, 16-year-old girl, M.B., who was vulnerable, had no place to go, and believed she had no alternative but to rely on him. The evidence showed that he groomed her, isolated her, and coerced her into selling her body for his sole benefit. Mr. Diaz involved M.B. in situations where he and his friend would pose as dates and then rob and beat up the women. He provided drugs to M.B., and threatened to kill her with a gun and throw her in a river, and/or hurt her mother were M.B. ever to escape him. The evidence showed that M.B. feared for her life, and had come to believe she was helpless and unable to leave Mr. Diaz.

Additionally, we find the impact statement of M.B. read at the sentencing hearing on March 2, 2020, to be compelling. In her statement, which was heavily relied upon by the trial court in making its decision regarding the appropriate sentence to impose upon Mr. Diaz, M.B. described Mr. Diaz as a predator, and claimed that she is still haunted by "memories of being trapped in a hotel selling [her] body to a stranger." M.B. expressed her hope that no one else would be brainwashed into believing that she would have "to be a sex slave for the rest of [her life] and that there's no way out." We agree with the trial court's assessment that the "facts [at trial] established [on the part of Mr. Diaz] a total, complete disregard for [M.B.] as a human being," and that this was "inexcusable."

Regarding the nature and background of Mr. Diaz, defense counsel and Mr. Diaz contend that the court did not have the benefit of a pre-sentencing investigation ("PSI") to adequately consider whether Mr. Diaz was the worst type of offender to justify the 65-year sentence. A PSI, however, is a tool used as an aid to the trial court, not a right of defendant, and whether a PSI is ordered is discretionary with the trial court. La. C.Cr.P. art. 875; *State v. Torres*, 05-260 (La. App. 5 Cir. 11/29/05), 919 So.2d 730, 735, *writ denied*, 06-697 (La. 10/6/06), 938 So.2d 65.

Here, the trial court did not order a PSI, because it apparently determined that it did not need one. During the original sentencing hearing, the trial court stated that, based on the testimony and evidence presented at trial, it came to the conclusion that Mr. Diaz was the "worst of the worst offenders." The trial court also stated that it was "cognizant of Mr. Diaz's prior criminal history."[29] It is apparent from the record that, at the time of sentencing, Mr. Diaz had other pending criminal charges for pandering and possession of cocaine. While we recognize that the predicate felony used for the multiple offender bill in this case was a nonviolent drug offense, which defense counsel argues supports the position that Mr. Diaz's enhanced sentence is constitutionally excessive, a defendant's non-violent offenses "cannot be the only reason, or even a major reason, for declaring such a sentence excessive." *State v. Lindsey*, 99-3256 (La. 10/17/00), 770 So.2d 339, 343. Mr. Diaz's conviction for trafficking of children for sexual purposes is a crime of violence under La. R.S. 14:2(B)(42). Our review of the record suggests that at no point during the course of the trial or sentencing did Mr. Diaz appear to be remorseful or to take responsibility for his actions. To the contrary, despite the

---

[29] A recitation of exactly what Mr. Diaz's prior criminal history consisted of, however, was not placed on the record.

enormity of the evidence adduced at trial, Mr. Diaz maintained that he did nothing wrong.

While we found no similar cases challenging the excessiveness of a sentence imposed by this court or other courts involving a second felony offender with an underlying conviction of human sex trafficking of children, we find that the extensive record in this case justifies the 65-year sentence at hard labor without benefit of parole or suspension of sentence imposed on Mr. Diaz, and does not shock this Court's sense of justice.[30] We find the sentence, which is well within the statutory range, is not grossly disproportionate to the offense nor does it impose needless or purposeless pain and suffering. Accordingly, we do not find the trial court abused its broad sentencing discretion in this case. This assignment of error is without merit.

## *Admission of Other Crimes Evidence*

In his first *pro se* assignment of error, Mr. Diaz challenges the trial court's admission of other crimes evidence at trial. He specifically contends the trial court erred in allowing the evidence when it was offered merely to show that he was a bad person and had a "propensity for crime." We disagree.

Prior to trial, the State filed its Notice of Intent to use other crimes evidence pursuant to La. C.E. Art. 404(B) and, in the alternative, *res gestae*. The State specified that it intended to introduce at trial evidence of other crimes committed by Mr. Dias during the chain of events leading up to his arrest, including: (1) a JPSO investigation involving Ms. Druckenmiller and Mr. Diaz; (2) a JPSO

---

[30] In his *pro se* brief, Mr. Diaz also avers that his sentence is constitutionally excessive because of racial remarks and threats to kill him made by the trial judge at the March 2, 2020 sentencing hearing, which statements he claims the court reporter omitted from the record. The original sentence imposed on March 2, 2020, however, was vacated. Therefore, any arguments relating to the underlying sentence are now moot. *See State v. Hanson*, 00-1168 (La. App. 5 Cir. 12/13/00), 778 So.2d 43, 45. We also note that Mr. Diaz failed to comply with Uniform Rules–Courts of Appeal, Rule 2–12.4, which sets forth the required contents of an appellant's brief, as his *pro se* brief provides no statutory law or jurisprudence regarding an excessive sentence and its application.

investigation involving Ms. Scala and Mr. Diaz; (3) a Louisiana State Police/FBI Investigation involving M.B. and Mr. Diaz; and (4) a Kenner police robbery investigation involving Mr. Diaz. In its motion, the State provided a summary of each investigation, and attached six exhibits: Exhibit 1, a JPSO crime report dated January 23, 2018, regarding a prostitution investigation involving M.B.; Exhibit 2, a series of registration forms from the Super 8 Motel from January 1, 2018 through January 24, 2018, including the registration for room 235, in Mr. Diaz's name with a copy of his driver's license; Exhibit 3, a JPSO crime report dated February 9, 2018, regarding a prostitution incident involving Ms. Druckenmiller and Mr. Diaz; Exhibit 4, a JPSO crime report dated February 28, 2018, involving Ms. Scala and Mr. Diaz; Exhibit 5, a FBI investigation report pertaining to M.B. involving prostitution and an application for a search warrant; and Exhibit 6, a Kenner Police report dated December 14, 2017, regarding an armed robbery investigation involving Mr. Diaz and another individual.

A hearing on the State's notice was held on April 25, 2019,[31] wherein the State submitted into evidence the six exhibits. In response, Mr. Diaz objected to the State's Exhibit 5 on grounds that he did not have a copy of the actual FBI report or application for a search warrant, that the investigation involved information obtained by another law enforcement agency that was unrelated to and did not coincide with "what the State of Louisiana has against [him] right now," and because he was not indicted on "that." Although given the express opportunity to do so at the hearing, Mr. Diaz did not present argument or otherwise object to the State's introduction of other crimes evidence at trial regarding the JPSO investigations involving Ms. Druckenmiller and Ms. Scala, the Kenner police

---

[31] Mr. Diaz was present and represented himself at the hearing, despite continued advisements by the trial court against doing so.

investigation, or the remaining five exhibits. At the close of the hearing, the trial court granted the State's 404(B) notice.

On appeal, in his argument that the trial court erred in admitting the other crimes evidence at trial, Mr. Diaz specifically delineates the "other crimes evidence" as consisting of the previously described six exhibits attached to the State's 404(B) notice of intent. Mr. Diaz argues at length that these six exhibits did not tend to prove a material fact at issue nor rebut his defense, and the prejudicial effect of the evidence outweighed its probative value. He also argues the "other crimes evidence" failed to prove opportunity, plan, preparation, knowledge, or any other permissible use under the article. Mr. Diaz contends the evidence should also have been excluded because it was not similar to the charged offense, and there was no clear and convincing "evidence of the commission of the other crimes or a connection" to him.[32]

At trial, however, while the State elicited testimony through various witnesses regarding the JPSO investigations of Ms. Druckenmiller and Ms. Scala, and the Kenner Police Department's robbery investigation of Mr. Diaz, the State *did not* seek to admit the corresponding reports generated as a result of those investigations (*i.e.*, Exhibits 1, 3, 4 and 6 attached to the State's 404(B) notice of intent). The State did, however, introduce other exhibits relating to evidence

---

[32] Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1); *State v. Prieur*, 277 So.2d 126, 128 (La. 1973). However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. *State v. Garcie*, 17-609 (La. App. 5 Cir. 4/11/18), 242 So.3d 1279, 1284. Evidence of other crimes is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad acts. La. C.E. art. 404(B)(1); *State v. Lawson,* 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 525. In order for other crimes evidence to be admissible, one of the factors enumerated in La. C.E. art. 404(B)(1) must be admissible, have some independent relevance, or be an element of the crime charged. *Garcie*, 242 So.3d at 1284. Moreover, the probative value of the extraneous evidence must outweigh the prejudicial effect. La. C.E. art. 404(B)(1).

obtained during those investigations.[33] Mr. Diaz did not object to either the testimony of the witnesses or to the admission of any of these other exhibits at trial. Additionally, Mr. Diaz was given the opportunity and did, in fact, cross-examine each of those witnesses.

During the State's examination of Special Agent Terry, wherein she provided testimony regarding the FBI's investigation pertaining to M.B. involving prostitution, the State sought to admit State's exhibits 31 through 34 into evidence.[34] Special Agent Terry identified the exhibits as registration information received from Econolodge, InTown Suites, LaQuinta Inn and Suites, and the Super 8 Motel, from October 10, 2017, through January 23, 2018, showing that each of the rooms were rented and paid for in cash by Mr. Diaz. When asked by the trial court if he had any objection to the introduction of these individual exhibits, on each occasion Mr. Diaz responded, "No, sir." Additionally, when the State sought to admit State's Exhibit 35,[35] which Special Agent Terry identified as the application for search warrant for a cell phone that she prepared in connection with the FBI investigation, the trial court asked Mr. Diaz if he had any objection, and he also responded, "No, sir." The FBI's written investigation report regarding M.B. was not offered nor introduced into evidence by the State. Mr. Diaz cross-examined Special Agent Terry regarding the FBI investigation.

After reviewing the trial transcript, we find Mr. Diaz did not properly preserve the right to appellate review of the trial court's alleged error in admitting other crimes evidence. La. C.Cr.P. art. 841(A) provides that "[a]n irregularity or

---

[33] The exhibits included photographs and advertisements of Ms. Druckenmiller and Ms. Scala placed on Backpage.com and text messages extracted from their cell phones

[34] State's Exhibits 32 through 34 admitted at trial correspond with State's Exhibit 2 attached to its pre-trial notice of intent to introduce other crimes evidence.

[35] State's Exhibit 35 admitted at trial corresponds with State's Exhibit 5 attached to its pre-trial notice of intent to introduce other crimes evidence, the only exhibit to which Mr. Diaz objected to at the 404(B) motion hearing.

error cannot be availed of after verdict unless it was objected to at the time of the occurrence." To preserve the right to appellate review of an alleged trial court error, a party must state a contemporaneous objection with the occurrence of the alleged error as well as the grounds for the objection. *State v. Enclard*, 03-283 (La. App. 5 Cir. 6/19/03), 850 So.2d 845, 853; *State v. Mitchell*, 11-1018 (La. App. 5 Cir. 6/28/12), 97 So.3d 494, 498-99.

At the pre-trial 404(B) notice of intent hearing, the only "other crimes evidence" that Mr. Diaz objected to was the admission of a FBI investigation report and application for a search warrant associated with that investigation. As previously stated, however, the State did not introduce the FBI report at trial, and even though Mr. Diaz objected to admission of the evidence at the pre-trial hearing, he consented to the admission of the search warrant application, State's Exhibit 35, at trial by saying, "No, sir," after the trial judge asked if he objected. By failing to contemporaneously object to the admission of the evidence, Mr. Diaz failed to preserve the issue of the admissibility of other crimes evidence for this Court's appellate review. *See State v. Patin*, 13-618 (La. App. 5 Cir. 9/24/14), 150 So.3d 435, 443, *writ denied*, 14-2227 (La. 4/22/16), 191 So.2d 1043; *see also State v. McGowen*, 16-130 (La. App. 5 Cir. 8/10/16), 199 So.3d 1156, *writ not considered*, 17-1675 (La. 10/27/17), 228 So.3d 1227. This assignment of error lacks merit.[36]

---

[36] We note that the erroneous admission of other crimes evidence has long been held subject to harmless error review. La. C.Cr.P. art. 921; *State v. Garcia*, 09-1578 (La. 11/16/12), 108 So.3d 1, 39, *cert. denied*, 570 U.S. 926, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013). An error is harmless, if the verdict was "surely unattributable" to the error. *McGowen*, *supra*, 199 So.3d at 1161-62. Here, even if Mr. Diaz had properly preserved the issue for our review, and even if we were to determine that the trial court erred in improperly admitting the evidence, we find that any such error is harmless because the jury's verdict in this case was "surely unattributable" to any alleged error. Mr. Diaz was charged with trafficking children for sexual purposes in violation of La. R.S. 14:46.3. This crime requires proof that Mr. Diaz knowingly recruited, harbored, transported, sold, purchased, received, isolated, enticed, obtained, or maintained the use of a person under the age of eighteen years old for the purpose of engaging in commercial sexual activity. M.B.'s testimony standing alone provided proof from which the jury could unanimously conclude that Mr. Diaz committed the crime.

## *Denial of Motion for New Trial*

In his second *pro se* assignment of error, Mr. Diaz asserts because his Sixth and Fourteenth Amendment rights were violated and he was deprived of a fair trial, the trial court erred in denying his motion for new trial.[37] Specifically, Mr. Diaz argues the trial court erred in denying his motion for new trial because the State intentionally deprived him of presenting evidence to the jury to see that contradicted a witness' testimony by refusing to provide him with printed copies of excerpts from a computer disc, which contained a download of the content on M.B.'s cell phone. Mr. Diaz claims that he was forced to present this evidence on a laptop that some of the jurors indicated they were unable to see, which prevented him from confronting an adverse witness and conducting an effective cross-examination regarding material facts. Mr. Diaz asserts that when he attempted to establish through his examination of M. B. that she had testified falsely about material facts, the State objected, thereby allowing false testimony from M.B. (and other witnesses) to go uncorrected, resulting in the jury being deprived of the "true" facts. He argues that but for this error, the outcome of the trial would have been different. We disagree.

Pursuant to La. C.Cr.P. art. 851(A), a new trial "is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is

---

[37] There appears to be a procedural irregularity involving the timing of Mr. Diaz's written motion for new trial. La. C.Cr.P. art. 852 requires a motion for new trial to be in writing. La. C.Cr.P. art. 853 provides, in pertinent part, that a "motion for new trial must be filed and disposed of before sentencing." At the sentencing hearing on March 2, 2020, Mr. Diaz stated that he had filed a written motion for new trial, however, the court's records indicated otherwise. Nonetheless, the trial court allowed Mr. Diaz the opportunity to make an oral motion and to orally argue his motion prior to sentencing. After hearing argument, Mr. Diaz's motion was orally denied, after which he was sentenced. After sentencing, but later that same date, the record shows that Mr. Diaz's written motion was stamped filed, and on March 3, 2020, the trial court signed the motion and wrote, "Motion for New Trial was denied in Open Court on 3/2/20." Because we find Mr. Diaz was given an opportunity to orally present and argue his motion prior to sentencing, and that the trial court did not err in denying the motion, we will presume for purposes of this appeal that the motion was timely filed.

grounded."[38]  A trial court's ruling on a new trial motion will not be disturbed on appeal absent a clear showing of an abuse of discretion.  *State v. Benoit*, 04-436 (La. App. 5 Cir. 9/28/04), 885 So.2d 625, 632.  Insofar as Mr. Diaz contends that the State allowed false testimony from several witnesses to go uncorrected, our review of the record reveals that Mr. Diaz did not lodge a *single* objection as to the testimony of *any* witness during the three-day trial.  Moreover, while the State did make several objections during Mr. Diaz's examination of certain witnesses, including his examination of M.B., some—but not all—were sustained on grounds of relevancy, hearsay, and the failure of Mr. Diaz to lay a proper foundation.  With respect to certain jurors being unable to see the text messages on the laptop during Mr. Diaz's examination of M.B., the record reflects that, in response to the State's objection of relevance, the trial court determined that Mr. Diaz had failed to lay the proper foundation establishing that the information contained on the disc was relevant, such that the evidence should have been seen by the jury.[39]

Mr. Diaz further asserts that the trial court erred in failing to grant his motion for new trial under La. C.Cr.P. art. 851(B)(1) because the State failed to prove every essential element of the charged offense or meet its burden of proof beyond a reasonable doubt, and that there existed a reasonable hypothesis of innocence.  He contends the State's case rested on evidence allowed under La. C.E. art. 404(B) of a federal investigation that did not result in an indictment, and on

---

[38]      Under La. C.Cr.P. art. 851(B), the trial court shall grant a new trial if, among other things: (1) the verdict is contrary to the law and the evidence; (2) the court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error; (3) new and material evidence is available that, despite the defendant's due diligence, was not discovered before or during the trial, and had the evidence been introduced at trial it would probably have changed the verdict, (4) the defendant has discovered, since the guilty verdict, a prejudicial error or defect in the proceedings that, despite the defendant's due diligence, was not discovered before the verdict; and (5) the ends of justice would be served by granting the new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right. *See* La. C.Cr.P. art. 851(B)(1) – (5)

[39]      Also, our review of the record supports the State's contention that it was never asked, ordered, nor otherwise refused to provide Mr. Diaz with printed copies of the downloaded information or extraction from M.B.'s cell phone contained on the computer disc.

evidence of an armed robbery for which he was not charged, resulting in prejudicial error under La. C.Cr.P. art. 851(B)(2). Further, Mr. Diaz argues that pursuant to La. C.Cr.P. art. 581(B)(3) and (4), despite the exercise of due diligence, after trial he discovered "new and material evidence" that the court reporter intentionally removed from the record, including perjured testimony by M.B., Deputy Cornejo, Detective Donahue, Sergeant Olivier, Lieutenant Hare, and Special Agent Terry. He claims that the original, authenticated audio recording of the entire trial—which he avers is "newly discovered evidence"—would contain this perjured testimony and probably result in a different verdict in the event of a new trial. To the contrary, based on our careful review of the testimony and evidence—none of which Mr. Diaz objected to at trial—we find that the State carried its burden of proving beyond a reasonable doubt that Mr. Diaz was guilty of trafficking children for sexual purposes. Accordingly, we find no error in the trial court's denial of Mr. Diaz's motion for new trial.[40]

### *State's Withholding of Exculpatory Evidence*

In his third *pro se* assignment of error, Mr. Diaz argues he did not receive a fair trial because the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Louisiana's ethical and professional rules.[41] Mr. Diaz also asserts that the State's failure to disclose evidence favorable to the defense violated the Sixth and Fourteenth

---

[40] Mr. Diaz also argues that under La. C.Cr.P. art. 851(5), based on the ends of justice, he should be granted a new trial. This Court has stated that a judgment denying a motion for new trial on these grounds is unreviewable by an appellate court, which may review the grant or denial only for error of law. *State v. Terrick*, 03-515 (La. App. 5 Cir. 9/30/03), 857 So.2d 1153, 1161, *writ denied*, 03-3272 (La. 3/26/04), 871 So.2d 346.

[41] Rule 3.8 of the Rules of Professional Conduct state that the prosecutor in a criminal case shall "make timely disclosure to the defense of all evidence or information known to the Prosecutor that tends to negate the guilt of the accused or mitigate the offense." *See* Rules of Professional Conduct, Rule 3.8(d).

Amendments, as well as La. C.Cr.P. arts. 23 and 729,[42] resulting in a tainted conviction that was based on testimony and evidence the State knew to be false.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1063), the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for it violates a defendant's due process rights where the evidence is material to either the guilt or punishment, without regard to the good or bad faith of the prosecutors. *See also State v. Bright*, 02-2793 (La. 5/24/04), 875 So.2d 37, 41-42. The duty to disclose is applicable even where there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The State's due process duty to disclose applies to both exculpatory and impeachment evidence. *State v. Kemp*, 00-2228 (La. 10/15/02), 828 So.2d 540, 545.

Evidence is "material" under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defendant. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. *State v. Wise*, 13-247 (La. App. 5 Cir. 11/19/13), 128 So.3d 1220, 1228, *writ denied*, 14-253 (La. 9/12/14), 147 So.3d 703. A reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial

---

[42] Following his conviction and sentencing, Mr. Diaz filed a Motion for Constructive Contempt for Prosecutorial Misconduct alleging counsel for the State violated La. C.Cr.P. arts. 23 and 729, when she deliberately disobeyed the trial court's February 11, 2020 order by not presenting him with the printed excerpts of the material downloaded from M.B.'s phone on the morning of February 12, 2020, and by knowingly allowing false evidence and testimony to go before the jury in order to obtain a verdict against him. Prior to filing his motion, however, the trial court had already granted Mr. Diaz an appeal, thereby divesting the trial court of jurisdiction to rule on Mr. Diaz's motion for constructive contempt. *See* La. C.Cr.P. art. 916. In his third assignment of error, Mr. Diaz raises the same arguments set forth in that motion.

resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

The Louisiana Supreme Court has recognized three elements of a *Brady* claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *State v. Garrick*, 03-137 (La. 4/14/04), 870 So.2d 990, 993.

In the case *sub judice*, the "exculpatory" evidence that Mr. Diaz claims the State failed to disclose includes: (1) excerpts from a computer disc, which contained a download of the content of the victim's cell phone; (2) evidence of a jail house call between Mr. Diaz and his sister that was used by the State during rebuttal; and (3) evidence regarding a telephone call made from the Jefferson Parish Correctional Center, wherein Mr. Diaz purportedly conveyed that he had no knowledge of the (Kenner) robbery, but the State used the evidence of the robbery against him at trial.[43]

Similar to the argument made in his previous assignment of error, Mr. Diaz avers that counsel for the State willfully disobeyed the trial court's February 11, 2020 order[44] to provide him with printed copies of excerpts from the downloaded content extracted from M.B.'s cell phone on the morning of February 12, 2020, so that he could properly present his defense that day. Mr. Diaz argues that in failing to comply with the order, counsel for the State violated La. C.Cr.P. arts. 23 and

---

[43]     It is unclear from Mr. Diaz's brief on appeal whether he is referring to a single "jail house" call made to his sister or whether he discussed his lack of knowledge regarding the Kenner robbery in a separate call. Only one jail house call that was made by Mr. Diaz to his sister was addressed at trial, during the State's rebuttal.

[44]     Mr. Diaz contends the court reporter removed from the record the bench conference wherein the trial judge purportedly issued the alleged order to the State on February 11, 2020.

729,[45] and *Brady*, and violated a duty owed by reason of her employment to assist the court in the administration of justice.

Our review of the record, however, indicates that no such order was ever issued by the trial court to counsel for the State on February 11, 2020. During a bench conference held on that date, Mr. Diaz confirmed his intention to discuss certain items contained on the disc during his examination of Sergeant Olivier, but was advised by the court that the disc had not yet been admitted into evidence. The record shows that, at that time, the parties agreed to have Sergeant Burke authenticate the disc the following morning on February 12, 2020. The parties also discussed Mr. Diaz calling M.B. for questioning about the contents of the cell phone extraction. At no point during that bench conference does the record indicate that the trial court ever ordered counsel for the State to provide Mr. Diaz with printed copies of the cell phone extraction.[46] On the morning of February 12, 2020, the State provided Mr. Diaz with a copy of the actual disc, which he reviewed, and requested Sergeant Burke to authenticate it for admissibility purposes. It appears that Mr. Diaz then attempted to use the disc on a laptop during his questioning of M.B. by having her read certain messages.

Acknowledging the juror's inability to see the evidence, the trial court sustained the State's objection that Mr. Diaz had failed to pose an actual question to M.B., and had failed to lay a proper foundation as to the relevance of the cell phone messages, and stated that until Mr. Diaz established that the information was relevant for the jury to see, "the fact that they can't see it is of no moment …" The

---

[45] La. C.Cr.P. art. 23 provides, in pertinent part, that "constructive contempt includes … willful neglect or violation of duty by … a person employed … to assist the court in the administration of justice." La. C.Cr.P. art. 729 states, in part, that if at any time prior or subsequent to final disposition the court finds that either the State or the defense has willfully failed to comply with a discovery order of the court, such failure shall be deemed to be a constructive contempt of court. *See* La. C.Cr.P. art. 729.5(B).

[46] Mr. Diaz alleges that the court reporter intentionally removed this exchange between the trial judge, counsel for the State, and Mr. Diaz from the record.

court then instructed Mr. Diaz that if he could show how the information was relevant, hard copies would likely be necessary in order for the jury to see it. In response, Mr. Diaz stated, "*Well, don't worry about it, Your Honor. I don't have any further questions.*" At that point, Mr. Diaz's questions to M.B. ceased.

We find that the record does not support Mr. Diaz's contention that the State violated La. C.Cr.P. arts. 23 or 729, or committed a *Brady* violation with respect to the disc containing the downloaded information extracted from M.B.'s cell phone. There is nothing in the record showing that the State was ordered on February 11, 2020, to provide Mr. Diaz with hard copies of the cell phone extraction, nor did he lodge a contemporaneous objection regarding the State's alleged constructive contempt for failing to do so. *See* La. C.E. art. 103(A)(1) and La. C.Cr.P. art. 841(A). "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of its occurrence." La. C.Cr.P. art. 841; *State v. Ruiz*, 06-1755 (La. 4/11/07), 955 So.2d 81, 87 (citations omitted). The contemporaneous objection rule applies to claims of prosecutorial misconduct such as the allegations asserted by Mr. Diaz herein. *State v. Hoffman*, 9803118 (La. 4/11/00), 768 So.2d 542, 582, *opinion supplemented*, 00-1609 (La. 6/14/00), 768 So.2d 592, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). We also find that Mr. Diaz's contention that a *Brady* violation occurred is misplaced. He was, in fact, provided with a physical copy of the disc, and the disc itself was authenticated and admitted into evidence. He failed to lay a proper foundation for the admissibility of the information contained on the disc, and then ceased his questioning of M.B. regarding that information.

Mr. Diaz also contends the State's failure to disclose the recording of Mr. Diaz's jailhouse call prior to trial, evidence that he contends was favorable to the defense, was a violation of La. C.C.P. art. 729 and constituted a *Brady* violation. We disagree.

The Louisiana Supreme Court has previously held that discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony to permit the defense to meet the State's case and allow proper assessment of the strength of its evidence in preparing a defense. *State v. Bradstreet*, 16-80 (La. App. 5 Cir. 6/30/16), 196 So.3d 876, 892, *writ denied*, 16-1567 (La. 6/5/17), 220 So.3d 752. The State has a continuing duty to disclose additional evidence which it discovers or decides to use at trial. *See* La. C.Cr.P. art. 729.3. A conviction will not be reversed on the basis of the State's discovery violation unless prejudice is shown. *State v. Harris*, 00-3459 (La. 2/26/02), 812 So.2d 612, 617.

When the evidence (in this case, the jailhouse call) is not used by the State on direct examination, nor mentioned during the State's opening statement, but only offered in rebuttal to counter the direct testimony presented by the defense, Louisiana courts have concluded that the State does not have the intent to use the evidence at trial, and therefore, there is no violation of the discovery statutes. *See State v. Hartford*, 14-643 (La. App. 4 Cir. 3/18/15), 162 So.3d 1202, 1212-14, *writ denied*, 15-768 (La. 3/14/16), 189 So.3d 1065; *see also State v. Amadee*, 409 So.2d 1259, 1261 (La. 1982).

In *State v. Hudson*, 19-761 (La. App. 4 Cir. 4/22/20), 299 So.3d 131, 136, in concluding that the State's failure to disclose recordings of the defendant's jailhouse calls prior to trial was not a violation of discovery rules, the reviewing Court applied the holding in *Hartford*, *supra*, and found the record reflected "that the State did not intend to use the recordings in its case in chief at trial, and used them only to rebut the defendant's testimony that he acted in self-defense." *Id*. at 137-138. Further, in response to the defendant's contention that the jailhouse calls constituted *Brady* material because they contained exculpatory statements that were material to guilt or punishment and the State's late disclosure during trial compromised his ability to present a complete defense, the Court disagreed. *Id*. at

138. Specifically, the Court found that the defendant failed to identify which and how the calls or statements were exculpatory. Additionally, although the defense was given the opportunity to use the recordings in re-direct examination of the defendant, the defense used none of them. Lastly, the Court disagreed that the disclosure of the recordings would have affected the preparation of the defendant's defense, including his decisions to testify or call other witnesses to testify. In short, the Court found the "defendant's speculative argument insufficient to establish a *Brady* claim. *Id.*

Similarly, our review of the record in the instant case confirms that the State did not use the recorded jailhouse call on direct examination nor mentioned the call during its opening statement. The record shows that during the State's cross-examination of Mr. Scala, who was called as a witness by Mr. Diaz during his case in chief, Ms. Scala denied that Mr. Diaz had dropped her off at a hotel, even after she was confronted with a phone call Mr. Diaz had made from jail to his sister, Candice, stating that he had dropped off a friend at a hotel and then people came to get him. Notably, Mr. Diaz did not object to the State's questioning of Ms. Scala regarding the call. Later, during rebuttal, the State called Detective Guidry, the JPSO custodian of records relative to jailhouse calls, to testify regarding a jailhouse call that occurred on March 2, 2018, between Mr. Diaz and his sister, Candace, and then published the call. At that time, Mr. Diaz objected on the basis that he had no knowledge of this evidence. In response, the State argued that Mr. Diaz's jailhouse call was being introduced to rebut Ms. Scala's prior testimony that Mr. Diaz had not dropped her off at a Super 8 Motel. The trial court overruled Mr. Diaz's objection on the ground that call was rebuttal evidence.

We find that the State only offered the recorded jailhouse call to rebut Ms. Scala's testimony (and Mr. Diaz's contention) that he was not present at the Super 8 Motel. The record does not support a finding that the State intended to use the

jailhouse call in its case in chief. Consequently, we find no violation of the discovery statutes. We also find that Mr. Diaz has not established a *Brady* violation because he has not identified how the recorded call is exculpatory. Moreover, to the extent Mr. Diaz alleges that Deputy Cornejo testified that counsel for the State "received knowledge through a telephone conversation that was had [sic] from the Jefferson Parish Correctional Center, via Securus, that Jared Diaz didn't have any knowledge of the robbery that was being used against him," and coerced him to testify falsely at trial, we find no support for these allegations in the record. Consequently, we find no *Brady* violation occurred. This assignment of error is also without merit.

### Ineffective Assistance of Counsel

In his final pro se assignment of error, Mr. Diaz argues that he was denied the right to effective assistance of counsel. Specifically, Mr. Diaz asserts the following:

> Jared Diaz contends that on September 30, 2020, 24th JDC public defender Ms. Renee Bourg stated in open court that if Jared Diaz didn't do what she wanted him to do she would make rape allegations against him. On February 3, 2021, Ms. Renee Bourg, stated in open court that what she and the Judge done [sic] was wrong, and they needed to protect each other. Ms. Renee Bourg stated on March 17, 2021, that she was joining with the State to find Jared Diaz incompetent. Ms. Renee Bourg has violated the lawyer client privilege by providing members of the Court with information that was discussed in private. Ms. Renee Bourg has also attempted to have her clients testify against Jared Diaz and also has tried to have them cause bodily harm to Jared Diaz.

Our careful review the record shows that it does not support Mr. Diaz's contentions. Further, we find that Mr. Diaz has failed to properly brief his argument concerning ineffective assistance of counsel. Under Uniform Rules– Courts of Appeal, Rule 2–12.4(B)(4), the Court may consider as abandoned any assignment of error or issue for review which has not been briefed. See also *State*

*v. Tranchant*, 10-459 (La. App. 5 Cir. 11/23/10), 54 So.3d 730, *writ denied*, 10-2821 (La. 4/29/11), 62 So.3d 108. Restating an assigned error in brief without argument or citation of authority does not constitute briefing. *State v. Marie*, 07-397 (La. App. 5 Cir. 11/27/07), 973 So.2d 780, 781. As to this assignment of error, Mr. Diaz does not present legal argument and fails to cite to any legal authority in support of his specific misconduct allegations. Accordingly, we consider Mr. Diaz's pro se assigned error as abandoned.

## ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). The following matters were discovered:

### 24 Hour Delay in Sentencing

Louisiana C.Cr.P. art. 873 mandates a 24-hour delay between the denial of a new trial motion and the imposition of sentence unless the defendant expressly waives a delay provided for in this article or pleads guilty, in which case sentence may be imposed immediately. In the present case, the denial of defendant's motion for new trial and the imposition of his original sentence occurred on March 2, 2020. As a general rule, when a defendant challenges a non-mandatory sentence and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing. *State v. Bibbins*, 13-875 (La. App. 5 Cir. 4/9/14), 140 So.3d 153, 169, *writs denied*, 14-994 (La. 12/8/14), 153 So.3d 439 and 14-1015 (La. 12/8/14), 153 So.3d 440. However, when the original sentence has been set aside in a habitual offender proceeding, as was the case here, the trial court's failure to observe the mandatory 24-hour delay required by La. C.Cr.P. art. 873 is harmless. See *State v. McCloud*, 04-1112 (La. App. 5 Cir. 3/29/05), 901 So.2d 498, 505, *writ denied*, 05-1450 (La. 1/13/06), 920 So.2d 235; *State v. Davis*,

00-278 (La. App. 5 Cir. 8/29/00), 768 So.2d 201, 214, *writ denied*, 00-2730 (La. 8/31/01), 795 So.2d 1205.

*Multiple Offender Commitment Order*

While the transcript of the multiple offender proceedings reflects the trial court ordered Mr. Diaz's enhanced sentence to be served without benefit of probation or suspension of sentence, the multiple offender commitment order does not recite these restrictions. At sentencing, Mr. Diaz was not given probation, and his sentence was not suspended. Where there is a discrepancy between the transcript and the minute entry, the transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983). Accordingly, we remand the matter to the trial court with instructions to correct the multiple offender commitment order to accurately reflect that Mr. Diaz's sentence is to be served without benefit of probation or suspension of sentence. We direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected multiple offender commitment order to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and to the Department of Corrections' legal department. See State v. Garcie, supra, 242 So.3d at 1290.

## DECREE

For the foregoing reasons, we affirm Mr. Diaz's conviction, multiple offender adjudication, and enhanced sentence, and we remand the matter for correction of an error patent as noted herein.

**CONVICTION AND SENTENCE AFFIRMED;**
**REMANDED FOR CORRECTION OF ERROR PATENT**

STATE OF LOUISIANA                          NO. 20-KA-381

VERSUS                                      FIFTH CIRCUIT

JARED DIAZ                                  COURT OF APPEAL

                                            STATE OF LOUISIANA

**WICKER, J., DISSENTS WITH REASONS**

I respectfully dissent from the majority's decision to affirm defendant's sixty-five year enhanced sentence as a second felony offender under La. R.S. 15:529.1. For the following reasons, it is my opinion that the enhanced sentence imposed is constitutionally excessive and that a lesser sentence would meet all of the societal goals of incarceration for this defendant without imposing an undue financial burden on the state.

Although defendant's sixty-five year sentence is within the statutory limits provided by La. R.S. 15:529.1, the imposition of a sentence within the statutory limits may still violate a defendant's constitutional right against excessive punishment. *State v. Smith,* 01–2574 (La. 1/14/03), 839 So.2d 1, 4. In considering whether the trial court abused its discretion in sentencing a defendant, a reviewing court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes by other courts.[1] *State v. Horne,* 11–204 (La. App. 5 Cir. 2/14/12), 88 So.3d at 569.

There is no question that the nature of the crime, trafficking children for sexual purposes under La. R.S. 14:46.3, is horrific. As pointed out by the majority, the evidence at trial reflects that **d**efendant, "preyed upon and took advantage of a young, 16-year-old girl, M.B., who was vulnerable, had no place

---

[1]As pointed out by the majority, there are no cases to provide sentencing guidance for an enhanced sentence for trafficking children for sexual purposes where the predicate crime to support the multiple bill is a nonviolent offense.

20-KA-381                          1

to go, and believed she had no alternative but to rely on him. The evidence showed that he groomed her, isolated her, and coerced her into selling her body for his sole benefit." The evidence further demonstrated that defendant "provided drugs to M.B., and threatened to kill her with a gun and throw her in a river, and/or hurt her mother were M.B. ever to escape him." A conviction for such a serious crime warrants a significant term of imprisonment and it is my opinion that the trial judge was within his discretion to sentence defendant to the maximum term of fifty years imprisonment for that conviction.

However, considering the background of this offender and the predicate crime used to support defendant's multiple offender conviction, it is my opinion that defendant's enhanced sentence under La. R.S. 15:529.1 is constitutionally excessive. In support of the multiple offender bill, the State relied upon defendant's prior conviction for distribution of marijuana—a non-violent offense committed by defendant at the age of twenty-four. The Louisiana Supreme Court has stated that "the classification of a defendant's instant or prior offenses as non-violent should not be discounted" and that a court may consider the violent or non-violent nature of defendant's prior crimes when reviewing a sentence for excessiveness. *State v. Johnson,* 97–1906 (La. 3/4/98), 709 So.2d 672, 676.

Given the classification of defendant's conviction for trafficking children for a sexual purpose as a violent offense and his adjudication as a second felony offender under La. R.S. 15:529.1, defendant will not be eligible for parole under the requirements set forth in La. R.S. 15:574.4[2] until he serves 75% of his sixty-five year sentence. The record reflects that defendant was arrested on February

---

[2] The provisions of La. R.S. 15:574.4 were amended during the date range of the underlying offense provided in the bill of information. The amendment, however, is not relevant to this defendant's parole eligibility calculation.

28, 2018, and appears to have remained incarcerated since that date. Therefore, defendant's sixty-five year sentence as a multiple offender in this case renders him eligible for parole at the age of 77, after serving 48.75 years of his sentence.

This effective life sentence imposes an undue burden on the taxpayers of the state, who must feed, house, and clothe this defendant for life. As this defendant ages, these costs will only increase due to the need for geriatric health treatments. See *State v. Bruce*, 11-991 (La. App. 5 Cir. 10/30/12), 102 So.3d 1029, 1036, *writ denied,* 12-2568 (La. 4/26/13), 112 So.3d 839; *State v. Hayes,* 97–1526 (La. App. 1 Cir. 6/25/99), 739 So.2d 301, 303, *writ denied,* 99–2136 (La. 6/16/00), 764 So.2d 955, and *State v. Burns,* 97–1553 (La. App. 4 Cir. 11/10/98), 723 So.2d 1013, 1020, *writ denied,* 98–3054 (La. 4/1/99), 741 So.2d 1282.

Considering the nature and background of this offender as well as the underlying non-violent crime relied upon to support the multiple offender bill in this case, it is my opinion that a fifty-year sentence—allowing defendant to be parole eligible at the age of 65—would meet all of the societal goals of incarceration for this defendant without imposing an undue financial burden on the state. See *Bruce, supra*.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 17, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 20-KA-381

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN D. ENRIGHT, JR. (DISTRICT JUDGE)
THOMAS J. BUTLER (APPELLEE)          LIEU T. VO CLARK (APPELLANT)

### MAILED

JARED DIAZ #524403 (APPELLANT)
RAYMOND LABORDE CORRECTIONAL
CENTER
1630 PRISON ROAD
COTTONPORT, LA 71327

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
BRITTANY BECKNER (APPELLEE)
LYNN SCHIFFMAN (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053